Paul M. Basta
Aidan Synnott
Kyle J. Kimpler
Sarah Harnett
Dan Youngblut
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Richard C. Godfrey, P.C.
Andrew B. Bloomer, P.C.
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654-3406
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

*MDL 2543 Counsel for General Motors LLC*

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Bankruptcy Counsel for General Motors LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY, et al.,<br>f/k/a General Motors Corp., et al.,<br><br>           Debtors. | Chapter 11<br><br>Case No. 09-50026 (MG)<br><br>(Jointly Administered) |
| In re:<br><br>GENERAL MOTORS LLC<br>IGNITION SWITCH LITIGATION<br><br>*This Document Relates To All Actions* | No. 14-MD-2543 (JMF)<br>No. 14-MC-2543 (JMF)<br><br>Hon. Jesse M. Furman |

**GENERAL MOTORS LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION TO WITHDRAW THE REFERENCE OF THE ECONOMIC LOSS**
**PLAINTIFFS' RULE 23 MOTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................7

I.      OLD GM'S BANKRUPTCY AND SALE OF ASSETS TO NEW GM...........................7

II.     THE MDL 2543 LITIGATION. .........................................................................8

III.    THE PRIOR PROPOSED SETTLEMENT.............................................................8

IV.     THE CURRENT PROPOSED SETTLEMENT........................................................9

ARGUMENT ......................................................................................................14

I.      THE PROPOSED SETTLEMENT RAISES SUBSTANTIAL PROBLEMS OF
        CONSTITUTIONAL AND NON-BANKRUPTCY FEDERAL LAW,
        REQUIRING WITHDRAWAL OF THE REFERENCE. .................................................15

        A.  The Proposed Settlement Requires Adjudication of Substantial Non-Bankruptcy
            Issues Under *Ortiz*, *Amchem*, Rule 23, and the Due Process Clause, Mandating
            Withdrawal of the Reference. ...............................................................................18

        B.  The Proposed Settlement Requires Adjudication of Whether the Due Process
            Clause Requires Separate Class Representatives and Counsel to Represent
            Plaintiffs With Conflicting Interests, Mandating Withdrawal of the Reference............24

        C.  The Proposed Settlement Requires Adjudication of Constitutional and Non-
            Bankruptcy Issues Relating to Whether Plaintiffs With No Injury Can Recover,
            Mandating Withdrawal of the Reference....................................................................27

II.     THE COURT SHOULD PERMISSIVELY WITHDRAW THE REFERENCE FOR
        CAUSE. .........................................................................................................29

        A.  Withdrawal of the Reference Promotes Judicial Economy. .........................................30

        B.  Withdrawal of the Reference Will Not Cause Significant Delay..................................43

        C.  Withdrawal of the Reference Promotes Uniformity in Bankruptcy
            Administration Because the Proposed Settlement Involves Issues More
            Commonly Addressed in the District Courts. ............................................................43

        D.  Withdrawal of the Reference Is Necessary to Prevent Plaintiffs' Forum
            Shopping. ...........................................................................................................45

        E.  Withdrawal of the Reference Avoids Unnecessary Appeals. .......................................46

CONCLUSION....................................................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1800Postcards, Inc. v. Morel*,
    153 F. Supp. 2d 359 (S.D.N.Y. 2001) ................................................................. 4, 6, 29, 41

*Am. Tel. & Tel. Co. v. Chateaugay Corp.*,
    88 B.R. 581 (S.D.N.Y. 1988) .................................................................................15

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................................... passim

*Big Rivers Elec. Corp. v. Green River Coal Co., Inc.*,
    182 B.R. 751 (W.D. Ky. 1995) ...............................................................................43

*Chemtura Corp. v. U. S.*,
    2010 WL 1379752 (S.D.N.Y. March 26, 2010) ....................................................16

*City of New York v. Exxon Corp.*,
    932 F.2d 1020 (2d Cir. 1991) ............................................................... 3, 14, 15, 47

*Complete Mgmt., Inc. v. Arthur Andersen, LLP (In re Complete Mgmt., Inc.)*,
    2002 WL 31163878 (S.D.N.Y. Sept. 27, 2002) .....................................................44

*Denney v. Deutsche Bank AG*,
    443 F. 3d 253 (2d Cir. 2006) .................................................................................27

*Dev. Specialists, Inc. v. Orrick, Herrington & Sutcliffe, LLP*,
    2011 WL 6780600 (S.D.N.Y. Dec. 23, 2011) ...............................................43, 46

*Doe v. Karadzic*,
    192 F.R.D. 133 (S.D.N.Y. 2000) ...........................................................................23

*General Media v. Guccione (In re General Media, Inc.)*,
    335 B.R. 66 (Bankr. S.D.N.Y. 2005) ....................................................................44

*Glatt v. Fox Searchlight Pictures, Inc.*,
    811 F.3d 528 (2d Cir. 2016) ..................................................................................47

*Hansberry v. Lee*,
    311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940) ....................................................24

*Houbigant, Inc. v. ACB Mercantile, Inc. (In re Hourbigant, Inc.)*,
    185 B.R. 680 (S.D.N.Y. 1995) ..............................................................................43

*In re Adelphia Commmc'ns Corp. Sec. & Derivative Litig.*,
    2006 WL 337667 (S.D.N.Y. Feb. 10, 2006) ...................................................16, 46

*In re Ames Dept. Stores Inc.*,
    512 B.R. 736 (S.D.N.Y. 2014).........................................................................15, 16

*In re Asalcol Antitrust Litig.*,
    907 F.3d 42 (2018).................................................................................................27

*In re Bayshore Wire Products Corp.*,
   209 F.3d 100 (2d Cir. 2000) ................................................................47

*In re Burger Boys, Inc.*,
   94 F.3d 755 (2d Cir. 1996) .................................................................43

*In re Casimiro*,
   2006 WL 1581897 (E.D. Cal. June 6, 2006) .........................................41

*In re Dana Corp.*,
   379 B.R. 449 (S.D.N.Y. 2007)..............................................................30

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*,
   1999 WL 782560 (E.D. Pa. Sept. 27, 1999)..........................................24

*In re Durso Supermarkets*,
   170 B.R. 211 (S.D.N.Y. 1994)..............................................................41

*In re Enron Corp.*,
   2006 WL 544463 (S.D.N.Y. Jan. 17, 2006) ..........................................38

*In re Ephedra Prod. Liab. Litig.*,
   329 B.R. 1 (S.D.N.Y. 2005) .....................................................6, 30, 31

*In re Findley*,
   993 F.2d 7 (2d Cir. 1993) ....................................................................26

*In re G.M. Crocetti, Inc.*,
   2008 WL 4601278 (S.D.N.Y. Oct. 15, 2008)........................................31

*In re Gen. Motors LLC Ignition Switch Litig.*,
   2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017)...................................38, 45

*In re Gen. Motors LLC Ignition Switch Litig.*,
   2018 WL 1638096 (S.D.N.Y. Apr. 3, 2018) ..........................................38

*In re Gen. Motors LLC Ignition Switch Litig.*,
   339 F. Supp. 3d 262 (S.D.N.Y 2018)...................................................34

*In re Gen. Motors, LLC Ignition Switch Litig.*,
   257 F. Supp. 3d 372 (S.D.N.Y. 2017)...............................34, 37, 38, 45

*In re General Motors LLC Ignition Switch Litig.*,
   2016 WL 3920353 (S.D.N.Y. July 15, 2016)....................33, 34, 37, 45

*In re J.P. Morgan Stable Value Fund ERISA Litig.*,
   2017 WL 1273963 (S.D.N.Y. Mar. 31, 2017).......................................23

*In re Joint E. & S. Dist. Asbestos Litig.*,
   982 F.2d 721 (2d Cir. 1992) ...............................................................26

*In re Katrina Canal Breaches Litig.*,
   628 F.3d 185 (5th Cir. 2010) .........................................................19, 23

*In re Literary Works in Elec. Databases Copyright Litig*,
   654 F.3d 242 (2d Cir. 2011) ...............................................................25

*In re Motors Liquidation Co.*,
447 B.R. 150 (S.D.N.Y. 2011)..................................................................20

*In re Motors Liquidation Co.*,
538 B.R. 656 (S.D.N.Y. 2015).............................................. 28, 29, 31, 46

*In re Motors Liquidation Co.*,
591 B.R. 501 (Bankr. S.D.N.Y. 2018) .....................................................9

*In re Motors Liquidation Co.*,
829 F.3d 135 (2d Cir. 2016) ....................................................................7

*In re Motors Liquidation Company*,
580 B.R. 319 (S.D.N.Y. 2018).............................................................9, 11

*In re Nasdaq Mkt.-Makers Antitrust Litig.*,
176 F.R.D. 99 (S.D.N.Y. 1997) ..............................................................27

*In re Orion Pictures Corp.*,
4 F.3d 1095 (2d Cir. 1993) .....................................................................30

*In re Pan Am Corp.*,
163 B.R. 41 (S.D.N.Y. 1993) .................................................................46

*In re Parmalat Finanziaria S.p.A.*,
320 B.R. 46 (S.D.N.Y. 2005) ...........................................................passim

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2019 WL 359981 (E.D.N.Y. Jan. 28, 2019) .............................................4

*In re Siegmund Strauss, Inc.*,
2013 WL 3784148 (Bankr. S.D.N.Y. July 17, 2013)...............................38

*In re Standing Order of Reference Re:  Title 11*,
12 Misc. 32 (S.D.N.Y. Feb. 1, 2012) .....................................................14

*In re Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Products Liab. Litig.*,
221 F.3d 870 (6th Cir. 2000) ............................................................19, 23

*In re Wilborn*,
609 F.3d 748 (5th Cir. 2010) ..................................................................47

*Jane Doe 30's Mother v. Bradley*,
64 A.3d 379 (Del. Super. Ct. 2012) ........................................................24

*Juris v. Inamed Corp.*,
685 F.3d 1294 (11th Cir. 2012) ..............................................................24

*Klein v. O'Neal*,
2006 WL 325766 (N.D. Tex. Feb. 13, 2006) ..........................................19

*LightSquared Inc. v. Deere & Co.*,
2014 WL 345270 (S.D.N.Y. Jan. 31, 2014) ......................................15, 17

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)................................................................................27

*Mishkin v. Ageloff*,
   220 B.R. 784 (S.D.N.Y. 1998)................................................................passim

*Moreno v. Deutsche Bank Americas Holding Corp.*,
   2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017) ....................................................23

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
   458 U.S. 50 (1982)........................................................................................17

*Opperman v. Path, Inc.*,
   2016 WL 3844326 (N.D. Cal. July 16, 2016) .................................................28

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999)......................................................................................passim

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ........................................................................... 22, 23, 24

*Picard v. Flinn Invs.*, LLC,
   463 B.R. 280 (S.D.N.Y. 2011)............................................................ 15, 17, 29

*Picard v. HSBC Bank PLC*,
   450 B.R. 406 (S.D.N.Y. 2011).................................................................... 3, 14

*ResCap Liquidating Trust*,
   518 B.R. at 265-66 ...........................................................................41, 45

*Schoenbaum v. E.I. Dupont De Nemours & Co.*,
   2009 WL 4782082 (E.D. Mo. Dec. 8, 2009) ...................................................35

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   492 B.R. 133 (S.D.N.Y. 2013)......................................................................15

*Smith v. MCI Worldcom, Inc.*,
   2000 WL 36726436 (N.D. Okla. Mar. 31, 2000) ............................................26

*Solutia, Inc.* v. *FMC Corp.*,
   2004 WL 1661115 (S.D.N.Y. July 27, 2004)...................................................40

*Stott v. Capital Fin. Servs., Inc.*,
   277 F.R.D. 316 (N.D. Tex. 2011) ............................................................18, 19

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015) ...........................................................................27

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ...............................................................................17, 28

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .....................................................................................23

*Wedtech Corp.* v. *London (In re Wedtech Corp.)*,
   81 B.R. 237 (S.D.N.Y. 1987) ........................................................................44

**Statutes**

28 U.S.C. § 1334(a) .......................................................................................14

28 U.S.C. § 1334(b) ........................................................................................14

28 U.S.C. § 157(d) ....................................................................................passim

**Other Authorities**

2018 Advisory Comm. Notes to the 2018 Amendments to FED. R. CIV. P. 23(e) ....................36

**Rules**

Delaware Superior Court Civil Rule 23 ..................................................................24

Federal Rule of Civil Procedure 23....................................................................passim

**Treatises**

1 *McLaughlin on Class Actions* § 5:10 (15th ed. Oct. 2018 Update) ................................3, 16, 18

2 *Newberg on Class Actions* § 4:4 (5th ed. Nov. 2018 Update)..................................................23

## INTRODUCTION

On February 1, 2019, individuals asserting late-filed economic loss claims against the GUC Trust filed a motion seeking approval under Federal Rule of Civil Procedure 23 of a proposed settlement agreement.  The motion seeks certification of two so-called "limited fund" nationwide classes—which Movants[1] variously estimate as including somewhere between 9.5 and 26 million individuals[2]—for the purpose of resolving the late-filed economic loss claims as well as the personal injury claims of individuals who do not and cannot satisfy Rule 23.[3]  The Movants ask the Bankruptcy Court to appoint unidentified class representatives and certain class counsel, and approve and direct notice to the proposed classes and others, all by March 11, 2019.

The fundamental issue before this MDL Court is whether the Bankruptcy Court should, within a few weeks, determine whether it is likely to certify two nationwide limited fund classes when this Court is poised to resolve myriad issues that would bear on the Bankruptcy Court's assessment of any such certification.  As this Court is aware, New GM and the MDL economic loss plaintiffs have already completed class certification briefing for the Bellwether States, as well as summary judgment and *Daubert* briefing.  Resolution of the issues raised in those briefs is critical to deciding whether any class of economic loss plaintiffs can be certified in this Court or in the Bankruptcy Court.  Indeed, the settling parties have inexorably linked the fate of their

---

[1]  "Movants" refers to Co-Lead MDL Counsel, who purport to have filed the Rule 23 Motion on behalf of "Economic Loss Plaintiffs."  But no such plaintiffs or proposed class representatives are identified in the motion or exhibits. (*See* Settlement § 2.67 and Schedule 3 thereto.)  Hereinafter, depending on the context, "Plaintiffs" refers to potential class members and others subject to the proposed settlement and/or Co-Lead Counsel.

[2]  *Compare* 12/20/18 Bankr. Hr'g Tr. at 4-5 (claiming that approximately 11.4 million vehicles are subject to the Recalls at issue, involving between 11.4 and 26 million individuals, but that the number may substantially decrease based on rulings from the MDL Court), excerpts attached as Ex. 1; *with* 5/25/2018 Bankr. Hr'g Tr. at 24 ("[D]on't hold me to the exact numbers, but I think we're down to . . . nine-and-a-half million cars."), excerpts attached as Ex. 2.

[3]  11/16/16 Bankr. Hr'g Tr. at 70:4-9 (Counsel for Pre-Sale Personal Injury claimants admitting that "with respect to the pre-closing ignition switch accident plaintiffs, we don't believe that could be a class proof of claim"), excerpts attached as Ex. 3.

proposed settlement to proceedings in this Court, acknowledging that this Court's summary judgment decision may affect "the size, scope or composition of the classes" (Settlement § 4.5) and that the GUC Trust should have the unilateral right to terminate the settlement agreement if Co-Lead Counsel appeals that summary judgment decision (Settlement § 10.2). Movants further have advised the Bankruptcy Court that this Court's rulings are "anticipated by June 2019"[4] and "depending on what [this Court] ultimately rules," there could be a "dramatic[] impact [on] the size of the universe, therefore who gets noticed, therefore the cost of notice."[5] All parties agree that Rule 23 issues must be resolved before any settlement can be preliminarily or finally approved and before any other proceedings can occur in the Bankruptcy Court.[6]

Under these circumstances, Judge Glenn should stay proceedings related to the proposed settlement in the Bankruptcy Court pending this Court's resolution of class certification, summary judgment, and *Daubert* briefing or, in the absence of a stay, this Court should withdraw the reference of the Rule 23 Motion from the Bankruptcy Court.[7] Both mandatory and permissive withdrawal of the reference are justified here.[8]

First, withdrawal of the reference is mandatory pursuant to 28 U.S.C. § 157(d) because the

---

[4] Plaintiffs' Letter dated 2/13/2019 (Bankr. Dkt. No. 14424, Dkt. No. 6480-1).

[5] Ex. 1, 12/20/18 Bankr. Hr'g Tr. at 9, 14.

[6] *See* Ex. 1, 12/20/18 Bankr. Hr'g Tr. at 4 (Plaintiffs' counsel discussing "amendment to Rule 23(e)(2)(B), which requires that the first step is to seek a finding from this Court, that this Court will likely be able to approve the settlement and our settlement purposes class certification").

[7] A copy of *General Motors LLC's Motion Pursuant to Section 105(a) of the Bankruptcy Code to (A) Stay Proceedings Relating to the Proposed Settlement and (B) Grant Related Relief* (without its exhibits, which consist of briefing already before this Court) is attached hereto as Exhibit 4.

[8] New GM seeks withdrawal of one of the two motions filed by the settling parties related to the proposed settlement: The Economic Loss Plaintiffs' Rule 23 Motion. (Bankr. Dkt. No. 14408; Dkt. No. 6477-1.) The GUC Trust also filed a motion related to the proposed settlement ("Rule 9019 Motion"). (Bankr. Dkt. No. 14409; Dkt. No. 6477-2.) New GM does not seek withdrawal of the Rule 9019 Motion at this time, because the Rule 23 Motion raises threshold class certification issues that all parties agree must be decided **before** either Court can address the Rule 9019 motion or conduct any other proceedings related to the proposed settlement. The GUC Trust itself has acknowledged that the relief requested by the Rule 9019 Motion may be granted only after entry of a proposed order preliminarily certifying the proposed limited fund classes. (Rule 9019 Mot. ¶ 7 ("***Following entry of the Preliminary Approval Order*** (as defined in the Settlement Agreement), the Parties request that this Court enter" the order requested in the Rule 9019 motion) (emphasis added).)

Rule 23 Motion would require the Bankruptcy Court "to engage in significant interpretation . . . of federal laws apart from the bankruptcy statutes." *Picard v. HSBC Bank PLC*, 450 B.R. 406, 409–13 (S.D.N.Y. 2011) (*quoting City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991)). The goal of the proposed hybrid class and non-class settlement is to generate a purported $10 billion in "allowed general unsecured claims" against Old GM for the purpose of triggering New GM's obligation to pay the maximum number of "Adjustment Shares."[9] To accomplish this goal, the GUC Trust has agreed to: (i) waive all defenses and consent to late-filed proofs of claim for economic loss on behalf of two nationwide putative classes and for personal injury; and (ii) ask the Bankruptcy Court to estimate the value of those claims, which allegedly "may" or "could" exceed more than $10 billion. In return, the GUC Trust would be released from liability for actual and potential economic loss and personal injury claims arising from six vehicle recalls. But other than paying $13.72 million in notice costs, the GUC Trust would provide no relief whatsoever to the putative economic loss classes or personal injury claimants and would retain over $450 million of its own net assets. As structured, the proposed settlement is unprecedented and poses serious non-bankruptcy issues under the Constitution and Rule 23, necessitating mandatory withdrawal:

- The proposed settlement seeks to certify a ***non-opt out*** class involving ***unliquidated monetary damages*** claims, but precisely such a settlement was rejected by the Supreme Court in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 842 (1999) (rejecting non-opt out limited fund settlement involving unliquidated damages, and noting "serious constitutional" concerns); 1 *McLaughlin on Class Actions* § 5:10, Rule 23(b)(1)(B)—Narrow use of limited fund mechanism post-*Ortiz* (15th ed. Oct. 2018 Update) ("In fact, after *Ortiz*, no decision, other than Judge Weinstein's now-reversed ruling in *In re Simon II Litigation*, . . . has certified a 'limited fund' class involving unliquidated damages, while numerous courts have either denied (b)(1)(B) certification or decertified (b)(1)(B) classes that had been certified under pre-*Ortiz* law.").

- Although the proposed settlement is presented under the guise of Rule 23, it ***excludes*** actual and potential personal injury and wrongful death claimants from the limited fund classes,

---

[9]   *See* 2009 Sale Agreement § 3.2 (requiring New GM to provide Adjustment Shares only if, among other things, "the Bankruptcy Court makes a finding that the estimated aggregate allowed general unsecured claims" against Old GM exceeds $35 billion).

but *includes* them as beneficiaries of the purported limited fund.  Such a "hybrid" settlement—where the purported limited fund would be shared by class members and non-class members alike—is not recognized under Rule 23, contrary to *Ortiz*, and unsupported in the law.

- The proposed settlement seeks to certify two **nationwide** classes, notwithstanding significant variations in state law among the 51 jurisdictions at issue.

- The Rule 23 Motion purports to rely on the opinions of Stefan Boedeker, thus implicating Constitutional and other non-bankruptcy issues that have already been fully briefed and are pending decision in this Court.  (Dkt. No. 6132 at 24-32.)

- In violation of *Ortiz*, the proposed settlement allows the defendant (the GUC Trust) to obtain mandatory releases from millions of individuals with no opt out rights while contributing less than 5% of its assets solely for notice costs.

- The proposed settlement would require class members and personal injury plaintiffs to forever waive and release their claims against the GUC Trust without knowing, among other things, whether the Adjustment Shares provision can or will ever be triggered, because such a determination would only be made **after** class certification and final approval of the proposed settlement.

Because these issues would require the Bankruptcy Court to engage in significant interpretation of federal laws apart from bankruptcy statutes, withdrawal of the reference is mandated.

Second, and alternatively, because the bankruptcy proceedings are "overlapping and interlocking" with the proceedings in this Court, permissive withdrawal is warranted under 28 U.S.C. § 157(d).[10]  Before any proposed nationwide limited fund class could be certified, the reviewing court must make specific findings under amended Rule 23(e) regarding the likely outcome of complex issues that have already been briefed in this Court, and which bear directly on class certification in both courts.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 359981, at *12 (E.D.N.Y. Jan. 28, 2019) (noting that amended Rule

---

[10]   *See, e.g., Mishkin v. Ageloff*, 220 B.R. 784, 800 (S.D.N.Y. 1998) (withdrawal of reference in core proceedings was warranted because the proceedings were "overlapping and interlocking"); *1800Postcards, Inc. v. Morel*, 153 F. Supp. 2d 359, 367 (S.D.N.Y. 2001) (where facts, transactions and issues underlying creditors' committee's complaint overlapped with claims pending in the District Court, "efficiency counsels withdrawing the referral of the Committee's claims").

23(e)(2) "appears to be more exacting" than the prior version of the rule). For example, the Bankruptcy Court would need to determine, based on a solid evidentiary record rather than conclusory pleadings, whether:

- Under Rule 23(a)(3), the claims or defenses of the (as-yet unidentified) class representatives are "typical" of the claims and defenses of the proposed classes or whether any subclasses are required, given that the proposed class claims implicate the laws of 51 jurisdictions;

- Under Rule 23(a)(4) and Rule 23(e)(2)(A), the (as-yet unidentified) class representatives adequately protect the interests of the class;

- Under Rule 23(b)(1) and the Supreme Court's decision in *Ortiz*, "the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims," *id*. at 838-39;

- Under Rule 23(b)(1), 23(e)(2)(D), and the Supreme Court's decision in *Ortiz*, the proposal treats class members equitably relative to each other; *id*.;

- Under Rule 23(e)(2)(C), the relief provided to the putative class members under the proposed settlement is "adequate," including how any recoveries to class members would be individually determined, allocated and distributed; and

- Under Rule 23, Article III of the United States Constitution, and the Rules Enabling Act, whether the proposed classes may include putative class members who have no injury-in-fact or legally cognizable claims, in light of Boedeker's analysis (relied on by the Plaintiffs in both courts) showing that 26.6% to 39.1% of respondents have no injury or damages under Plaintiffs' theory. (Dkt. 6132 at 2.).

These same issues are squarely before this Court in the pending class certification, *Daubert*, and summary judgment briefing, creating overwhelming overlap and justifying permissive withdrawal.

Both proceedings involve virtually all of the same vehicle models, six of the same recalls, most of the same legal issues, the same expert testimony, many of the same personal injury claimants (at least 136), and, with respect to the Delta Ignition Switch Class, more than one million of the same potential class members (depending on which of Movants' widely varying estimations

of the size of the class is used).[11]   In addition, the requirements of Rule 23(a) must be met for either a Rule 23(b)(3) class (in the MDL) or a Rule 23(b)(1)(B) class (under the proposed settlement).

The Movants' sole purported expert in connection with their proposed settlement is Boedeker; if the reference is not withdrawn, both this Court and the Bankruptcy Court would be required to determine whether Rule 23, Article III, and the Rules Enabling Act permit certification of a class that includes, according to Boedeker's own analysis, 26.6% to 39.1% of respondents who suffered no injury or damages whatsoever.

Finally, the Bankruptcy Court cannot assess "the totals of the aggregated liquidated claims," as required by *Ortiz*, 527 U.S. at 838-39, without this Court's resolution of summary judgment and Boedeker-*Daubert* issues.

Given the substantial overlap between the proposed settlement and the MDL proceedings, withdrawal of the reference will result in the most efficient use of judicial resources and avoid serious risk of inconsistent rulings.[12]   Permissive withdrawal of the overlapping claims is particularly appropriate because this Court has been charged with the "unique responsibility" of overseeing this MDL proceeding.  *See In re Parmalat Finanziaria S.p.A.*, 320 B.R. 46, 50–51 (S.D.N.Y. 2005) (the MDL proceeding constitutes a "higher interest" that justifies withdrawal, even of core proceedings); *see also In re Ephedra Prod. Liab. Litig.*, 329 B.R. 1, 4 n.1 (S.D.N.Y. 2005).

---

[11]   *Compare* Rule 23 Mot. at 3 ("The 'Ignition Switch Class' is defined as all persons asserting economic loss claims who, prior to July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047."); 5ACC ¶ 945 (defining the Delta Ignition Switch Defect Successor Liability Subclass as "All persons who bought or leased a Delta Ignition Switch Vehicle on or before July 9, 2009"); 5ACC at 2 (defining "Delta Ignition Switch Vehicles" as "the vehicles included in Recall No. 14v047"); MDL Class Cert Mot. at 6 (defining the Missouri Delta Ignition Switch Defect Successor Liability Class as "All persons who bought or leased in the State of Missouri a Delta Ignition Switch Vehicle at some point before July 10, 2009").   Although MDL plaintiffs are not pursuing Delta Ignition Switch Defect Successor Liability Subclasses in California and Texas, they are pursuing such successor liability claims in other non-bellwether states.

[12]   *See, e.g., 1800Postcards, Inc. v. Morel*, 153 F. Supp. 2d at 367;*Mishkin v. Ageloff*, 220 B.R. at 800.

Accordingly, for these reasons and as discussed in detail below, this Court should withdraw the reference of the Rule 23 Motion from the Bankruptcy Court.

## BACKGROUND

### I.   OLD GM'S BANKRUPTCY AND SALE OF ASSETS TO NEW GM.

In July 2009, New GM purchased substantially all of Old GM's assets.  Section 3.2(c)(i) of the Sale Agreement (as amended) provides that New GM will be required to issue certain "Adjustment Shares" if, among other things, the amount of aggregated general unsecured claims against the estate exceed a certain amount.  (Sale Agreement § 3.2(c)(i)) (providing that Old GM may "seek an Order of the Bankruptcy Court (the 'Claims Estimate Order') . . . estimating the aggregate allowed general unsecured claims against Sellers' estates," and "if in the Claims Estimate Order, the Bankruptcy Court makes a finding that the estimated aggregate allowed general unsecured claims against Sellers' estates exceed $35,000,000,000," then New GM will issue additional shares of Common Stock (*i.e.*, the Adjustment Shares)).)   The number of Adjustment Shares depends on the amount by which the aggregate allowed general unsecured claims exceed the $35,000,000,000 threshold.  (Sale Agreement § 3.2(c).)

After the Sale, at the request of Old GM, the Bankruptcy Court entered an order establishing November 30, 2009 as the deadline for general unsecured creditors to file proofs of claims against Old GM.  Following the Second Circuit's decision in *In re Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016)—which held that plaintiffs with claims against the estate relating to the Delta ignition switch defect were not provided adequate notice of the sale of assets from Old GM to New GM and vacated the Bankruptcy Court's equitable mootness ruling—the Bankruptcy Court ordered that any late claims motions related to recalls must be filed by December 22, 2016.[13]

---

[13]   "If other plaintiffs wish to join in a Late Claim Motion, they . . . [were required to] file a joinder (not to exceed two pages) with the [Bankruptcy] Court by January 6, 2017."  (Bankr. Dkt. No. 13802.)  Only two joinders were

On that date, two economic loss claimants purported to file proposed nation-wide class claims under Rule 23(b)(3).

The current total amount of allowed general unsecured claims asserted against the GUC Trust is less than $32 billion, approximately $3 billion less than the amount necessary to cause New GM to issue any Adjustment Shares, and approximately $10 billion less than the amount necessary to cause New GM to issue the maximum number of Adjustment Shares.  (GUC Trust's Quarterly Section 6.2(c) Report, Bankr. Dkt. 14402.)

## II.   THE MDL 2543 LITIGATION.

In 2014 the Judicial Panel on Multidistrict Litigation established MDL 2543, and transferred to this Court claims related to ignition switch and other alleged defects (*i.e.*, the same defects that are the subject of the proposed settlement) in vehicles manufactured by Old GM and New GM that are subject to certain recalls.  The Fifth Amended Consolidated Complaint (the "5ACC") alleges economic loss class claims against New GM on behalf of those who purchased or leased certain Old GM or New GM vehicles.  There has been substantial motion practice on the 5ACC, and this Court is now considering motions for summary judgment, class certification, and exclusion of various experts under *Daubert* relating to plaintiffs' economic loss claims in three bellwether states (Texas, Missouri, and California).  Resolution of these motions will determine (among other things) whether Plaintiffs' claims and alleged injuries and damages are legally cognizable, and whether Plaintiffs can meet the requirements of Rule 23, Article III, and the Rules Enabling Act.

## III.   THE PRIOR PROPOSED SETTLEMENT.

On May 3, 2018, the GUC Trust filed a motion in the Bankruptcy Court seeking approval

---

filed to the Late Claims Motions by January 6, 2017.

of a proposed settlement that sought, without regard to Rule 23, to resolve claims against Old GM filed by certain personal injury and wrongful death plaintiffs, as well as proofs of claims purportedly on behalf of economic loss plaintiffs nationwide.[14]  The Movants filed a notice of "amended" proofs of claims (which "amendment" has not been authorized by any court) seeking relief under Rule 23(b)(3) (the "Proposed Class Claims") on April 24, 2018.  At a status conference on May 25, 2018, the Bankruptcy Court requested briefing on the "gating issue" of whether the prior proposed settlement required compliance with Rule 23 and noted that "[i]f the issue was whether . . . economic loss classes should be certified, and that issue is in the process of being briefed in discovery or whatever before Judge Furman, I'm strongly disinclined to try and jump the gun and decide the issue before Judge Furman does."  (Ex. 2, 5/25/18 Bankr. Hr'g Tr. 5/25/2018 at 22.)

Following a hearing, the Bankruptcy Court held that the structure of that proposed settlement was fundamentally flawed because it did not seek application of Rule 23.  *In re Motors Liquidation Co.*, 591 B.R. 501 (Bankr. S.D.N.Y. 2018).

## IV.    THE CURRENT PROPOSED SETTLEMENT.

The motions filed on February 1, 2019 (*see* n.8, *supra*) seek approval of the proposed settlement of the remaining actual and unasserted personal injury/wrongful death claims as well as potential economic loss claims on behalf of two nationwide classes.[15]  Unlike plaintiffs in the MDL, the Plaintiffs do not assert class claims under Rule 23(b)(3) (though they have not sought

---

[14]    On January 18, 2018, the Bankruptcy Court ruled that a still earlier alleged settlement agreement negotiated by plaintiffs and the GUC Trust but never executed was not enforceable.  *See In re Motors Liquidation Company*, 580 B.R. 319, 364 (S.D.N.Y. 2018).

[15]    Paragraph 50(d) of the 9019 Mot. further states:  "In light of the benefits of the Settlement, the GUC Trust agrees that, subject to the entry of the Final Approval Order, it will seek the entry of a Claims Estimate Order that: (i) estimates the aggregate allowed General Unsecured Claims of Plaintiffs against Sellers and/or the GUC Trust pursuant to Section 5.1 of the GUC Trust Agreement, Section 7.3 of the Plan, Section 3.2(c) of the AMSPA, and the Side Letter, in an amount that, as of the date of the Estimation Order, could equal or exceed $10 billion, thus triggering the issuance of the maximum amount of the Adjustment Shares."

to amend their Proposed Class Claims seeking relief solely under Rule 23(b)(3)); instead, the centerpiece of the proposed settlement is certification of the purported economic loss claims of two nationwide non-opt out "limited fund" classes under Rule 23(b)(1)(B) (or Rule 23(b)(1)(A) in the alternative).  As in the MDL, Plaintiffs claim to meet all of the requirements of Rule 23(a).

The proposed Ignition Switch Class includes "owners and lessees of vehicles asserting late-filed economic loss claims against the GUC Trust related to the [Delta] Ignition Switch Defect (Recall No. 14V-047)."  (Rule 23 Mot. ¶ 41.)  Notably, the same Ignition Switch Plaintiffs assert claims in the MDL Court on behalf of the same putative class members.[16]  Movants also propose a "Non-Ignition Switch Class" including owners and lessees of vehicles asserting late-filed economic claims against the GUC Trust related to various Non-Ignition Switch Defects (Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118, and 14V-153) (together with the Delta Ignition Switch Recall (14V-047), the "Recalls").  (Rule 23 Mot. ¶ 41.)  Economic loss claims related to each of these recalls are at issue in the MDL.  Both classes are represented by Co-Lead Counsel.  According to Movants, the proposed classes encompass millions of vehicles.  (*Id.* ¶ 10.)  Plaintiffs assert identical causes of action in the Bankruptcy Court and the MDL:  (i) fraudulent concealment; (ii) unjust enrichment; (iii) consumer protection claims; (iv) breach of the implied warranty of merchantability; and (v) negligence.  (Rule 23 Mot. ¶ 35; 5ACC at 3-4.)

The proposed settlement also seeks to resolve the claims of any and all "Pre-Closing Accident Plaintiffs," defined broadly in the agreement as "plaintiffs asserting personal injury or wrongful death clams based on or arising from an accident that occurred before the closing Date involving an Old GM vehicle that was later subject to [the same recalls specified in connection

---

[16]    The MDL claims include an additional successor liability component, but both the MDL claims and the Bankruptcy Court claims require plaintiffs to establish Old GM's underlying liability.

with the economic loss claims]."  (Settlement Preamble ¶ S.)[17]  All of these actual or potential "Pre-Closing Accident Plaintiffs" are "Plaintiffs" who may share in the Settlement Fund, along with members of two proposed economic loss classes.  *Id.* § 2.51.  A small subset of Pre-Closing Accident Plaintiffs are represented by counsel who signed the agreement, and these 442 plaintiffs are specifically named in the agreement and expressly included in the Release Provision.  *See id.* § 5.3.[18]  However, as drafted, the proposed Final Order and notices for the proposed settlement purport to ***release*** the claims of any and all Pre-Closing Accident Plaintiffs, regardless of whether they have asserted or filed claims.[19]  But Movants neither represent nor seek to certify a class of these Pre-Closing Accident Plaintiffs, which would be the only way to attempt to settle and release these absent parties' claims.  *See In re Motors Liquidation Co.*, 580 B.R. 319, 364 (S.D.N.Y. 2018) (holding that Rule 23 certification was necessary to settle absent parties' claims).[20]  The terms of the settlement agreement are in irreconcilable conflict with the terms of the draft notices and Final Order.  If, for example, the draft notices accurately describe the terms of the settlement agreement, then the notices are misleading, because a release in the agreement would be ineffective to bind

---

[17]  The Rule 23 Motion and exhibits (including the settlement agreement, proposed orders, and proposed notice) contain different, conflicting definitions of the plaintiffs or potential personal injury/wrongful death plaintiffs purportedly covered by the agreement, as New GM will describe in more detail in its Objection to the proposed settlement to be filed in the Bankruptcy Court, a copy of which will be provided to this Court.

[18]  Of the 442 plaintiffs specifically identified in the agreement, 152 are already eligible for settlements as a result of agreements in principle reached by their lawyers and New GM in the last several months.  Of the remaining 290 named in the agreement, 245 filed or attempted to file proofs of claims in the Bankruptcy Court, and 136 of these have also filed claims in the MDL.  At least 45 claimants identified in the proposed settlement never filed or sought leave to file late proofs of claims in the Bankruptcy Court.

[19]  *See, e.g.*, Rule 23 Mot. Ex. C, Final Order ¶ 9 (release applies to "All Plaintiffs"); Ex. D, Short Form Notice ("The Settlement includes 'Affected Persons' in the United States who, prior to July 10, 2009, bought or leased certain Old GM vehicles or suffered personal injury or wrongful death in an accident involving certain Old GM vehicles."); Ex. G, Long Form Notice at 5 ( "Under the Settlement, each Affected Person will be deemed to have forever waived and released (the 'Waiver') any claims….").

[20]  Ex. 3, 11/16/16 Bankr. Hr'g Tr. at 70:4-9 ("MR. WEINTRAUB: Of course, there are two additional wrinkles to the late-filed claim issue.  With respect to the pre-closing ignition switch accident plaintiffs, we don't believe that could be a class proof of claim.  We— THE COURT: As to the accident plaintiffs, I would agree it couldn't be a class proof of claim.").

persons who are not parties.  On the other hand, if the settlement agreement does not purport to release such persons, then the notices are deceptive, because by informing potential plaintiffs that their claims were released, the notices would minimize the likelihood that claims would be filed— thus effectively accomplishing indirectly what the settlement agreement could not accomplish directly.

The Movants propose three "stages" of proceedings with respect to the proposed settlement.  (Rule 23 Mot. ¶ 116.)  In Stage One, the Movants intend to obtain the Bankruptcy Court's approval of the proposed settlement.  *Id.*  In this stage, the Movants first ask the Bankruptcy Court to preliminarily approve the proposed settlement under Rule 23(e).  If the settlement is preliminarily approved, they seek permission to spend $13.72 million on a "state of the art notice program" for millions of individuals with purported economic loss and/or personal injury claims. *Id.*  The Movants seek a hearing for all of this relief on March 11, 2019.  If such relief is granted, notice would be mailed a few weeks later.  (Ex. 1, 12/20/18 Bankr. Hr'g Tr. at 11.)  Finally, after some indeterminate period of time, the Movants will seek the Bankruptcy Court's final approval of the settlement, including final certification of the proposed classes.  Among other things, the Movants anticipate that the Bankruptcy Court will also approve full releases in favor of the GUC Trust and non-parties, the GUC Trust Beneficiaries, the Avoidance Action Trust, and defendants in certain term loan litigation pending in the Bankruptcy Court, at this stage.  At this point, the proposed settlement will be finally approved, and the release and waiver of claims will be binding, but no class member or personal injury plaintiff will know whether, if ever, they will be eligible to make a claim to receive any settlement consideration, or whether there will ever be a settlement fund from which to recover.

In Stage Two, the Movants intend to pursue a "claims estimation proceeding with guidance

from Judge Furman's rulings in the MDL."  (12/12/18 Movants' Letter (Bankr. Dkt. No. 14383); *see also* Rule 23 Mot. ¶ 116.[21])  Movants have not specified any proposed procedures for Stage Two (which will determine, if the proposed settlement is approved, what relief, if any, is available to be shared by the putative classes and personal injury/wrongful death plaintiffs).  (Rule 23 Mot. ¶ 116.)  Moreover, the Movants acknowledge that the output of the Stage Two estimation proceeding may leave the economic loss and personal injury/wrongful death plaintiffs **with no recovery at all**, because the GUC Trust is not providing *any* consideration to the settlement fund and "there is no guarantee that the claims estimate order will require New GM to issue any shares." (emphasis omitted) (Rule 23 Mot. Ex. D.)  It is not until this Stage Two (or afterward) that the claims asserted by the putative classes, the personal injury/wrongful death plaintiffs, or any other potential plaintiffs will become liquidated—and all of this is to occur long after the proposed classes and settlement have been finally and irrevocably approved, and releases granted.

In Stage Three, Movants anticipate seeking the Bankruptcy Court's approval of "allocation and distribution procedures," which are neither specific nor described.  (Rule 23 Mot. ¶ 117.)  In this stage, Co-Lead Counsel and the personal injury lawyers who signed the settlement agreement propose to determine (subject to court approval) how to allocate the value (if any) in the settlement fund among the proposed classes and any actual or potential personal injury/wrongful death plaintiffs, which purportedly will be "guided by, and flow from, the [Bankruptcy] Court's determinations in the estimation proceedings."  *Id.*  Movants acknowledge that any allocation may require "additional or different subclasses [to] be created at [Stage Three], if necessary."  *Id.* Accordingly, although virtually nothing is disclosed about the proposed allocation procedures, Movants concede that Stage Three may reverse or fundamentally modify any final class

---

[21]   Movants refer to the estimation proceeding as Stage Three in their December 12, 2018 letter, but re-labeled it as Stage Two in the Rule 23 Motion.

certification order obtained in Stage One.  Incredibly, Movants affirmatively state that at this late stage, the certified classes may have to be "decertified" or "re-jiggered[.]"  (Ex. 1, 12/20/18 Bankr. Hr'g Tr. at 11 ("There is a possibility, at that stage, that the class could be decertified, re-jiggered, you know, if any party in interest felt that their interests weren't being adequately protected in terms of the allocation methodology that the parties ultimately put forward that Your Honor will be asked to approve.").)  Movants do not explain how an already settled and finally approved class can be decertified, consistent with the requirements of Rule 23 and the Constitution.

## ARGUMENT

United States District Courts have "original and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(a), (b).  In the Southern District of New York, such cases and proceedings are referred automatically from the District Court to the Bankruptcy Court.  *See In re Standing Order of Reference Re:  Title 11*, 12 Misc. 32 (S.D.N.Y. Feb. 1, 2012).

However, 28 U.S.C. § 157(d) provides two grounds for withdrawal of the reference.  First, the district court ***must*** withdraw the reference pursuant to § 157(d) if the bankruptcy court would otherwise "be obliged 'to engage in significant interpretation . . . of federal laws apart from the bankruptcy statutes'" (*i.e.*, mandatory withdrawal).  *Picard v. HSBC Bank PLC*, 450 B.R. 406, 409–13 (S.D.N.Y. 2011) (quoting *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991)).  Alternatively, the statute permits the district court to withdraw the reference "for cause" (*i.e.*, permissive withdrawal).  *Picard*, 450 B.R. 406, 409.[22]  Here, both standards are satisfied and

---

[22]   *See* 28 U.S.C. § 157(d) ("The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party for cause shown.  The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities

this Court should withdraw the reference to the Bankruptcy Court of Plaintiffs' Rule 23 Motion.

## I.     THE PROPOSED SETTLEMENT RAISES SUBSTANTIAL PROBLEMS OF CONSTITUTIONAL AND NON-BANKRUPTCY FEDERAL LAW, REQUIRING WITHDRAWAL OF THE REFERENCE.

"The purpose of § 157(d) is to assure that an Article III judge decides issues calling for more than routine application of [federal laws] outside of the Bankruptcy Code." *In re Ames Dept. Stores Inc.*, 512 B.R. 736, 740 (S.D.N.Y. 2014) (citation omitted; alteration in original); *Am. Tel. & Tel. Co. v. Chateaugay Corp.*, 88 B.R. 581, 583-84 (S.D.N.Y. 1988) ("Section 157(d) reflects Congress's perception that specialized courts should be limited in their control over matters outside their areas of expertise . . . [and that non-bankruptcy law] will be considered outside the narrow confines of a bankruptcy court proceeding by a district court, which considers law regulating interstate commerce and is better equipped to determine them than are bankruptcy judges"); *see also Picard v. Flinn Invs.*, LLC, 463 B.R. 280, 288 (S.D.N.Y. 2011) ("'Congress enacted 28 U.S.C. § 157 in response to'" the Supreme Court's holding 'that Congress' broad grant of jurisdiction to the bankruptcy courts . . . was an impermissible vesting of the judicial power of Article III courts in Article I adjuncts.'") (citation omitted).

The district court must withdraw the reference of matters that require "significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes." *City of N. Y. v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991); *see also LightSquared Inc. v. Deere & Co.*, 2014 WL 345270, at *3 (S.D.N.Y. Jan. 31, 2014) (mandatory withdrawal necessary where bankruptcy court would have to determine issues relating to the Noerr–Pennington doctrine and the First Amendment); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 492 B.R. 133, 139 (S.D.N.Y. 2013) (mandatory withdrawal needed to consider equitable

---

affecting interstate commerce.").

doctrine of laches, which is "a matter of federal non-bankruptcy common law"); *Chemtura Corp. v. U. S.*, 2010 WL 1379752, at *2 (S.D.N.Y. March 26, 2010) (CERCLA).

The district court "need not resolve the merits of [the parties'] positions for purposes of th[e] motion," and the matter need not be one of first impression. *In re Ames*, 512 B.R. 736, 741 (alteration in original); *see also In re Adelphia Commmc'ns Corp. Sec. & Derivative Litig.*, 2006 WL 337667, at *4-5 (S.D.N.Y. Feb. 10, 2006) ("[T]he requisite 'substantial and material consideration,' or 'significant interpretation'"… does not … mean that there must necessarily be 'complicated interpretative issues, often of first impression.'") (internal citations omitted).

In this case, withdrawal is required because the Rule 23 Motion requires substantial and material consideration of numerous Constitutional and non-bankruptcy federal law issues, many of which are already pending in this Court. Movants seek to certify non-opt out, nationwide limited fund classes involving tort claims for unliquidated monetary damages. However, the Supreme Court has imposed "strict limitations" on the availability of such classes. 1 *McLaughlin on Class Actions* § 5:10 ("[c]ases interpreting [*Ortiz*] have enforced the strict limitations the Supreme Court imposed on the availability of limited fund class actions with rare exception.").[23] As the Supreme Court has recognized, proposed non-opt out classes involving unliquidated monetary damages claims raise "serious constitutional concerns." *Ortiz*, 527 U.S. at 817 (rejecting limited fund settlement involving unliquidated damages as contrary to Rule 23); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (rejecting settlement class under Rule 23 and stating that the Due Process Clause required representation of plaintiffs with conflicting interests).

In addition to the serious Constitutional concerns posed by its limited fund structure, the proposed settlement implicates other Constitutional issues raised by the proposed economic loss

---

[23] *See* discussion on page 23 & n.31, *infra*, regarding the post-*Ortiz* cases cited by Plaintiffs.

classes already before this Court.  Like the MDL economic loss plaintiffs, Movants rely on the economic loss damages opinions of Stefan Boedeker.  (Rule 23 Mot. ¶ 38.)  As New GM has previously explained in its opposition to MDL plaintiffs' motion for class certification, Boedeker's own "data shows that 26.6% to 39.1% of respondents have no injury or damages under plaintiffs' theory."  (Dkt. No. 6132 at 2.)  Rule 23, Article III, the Rules Enabling Act, and Second Circuit precedent all bar certifying a class without common injuries.  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1050 (2016) (remanding for further proceedings a litigated class action that included hundreds of uninjured class members, which raised an Article III standing question of "great importance" that was not ripe for review); *see also* Dkt. No. 6132 at 24-32.

These and other Supreme Court cases confirm that Plaintiffs' proposed classes and settlement violate the Due Process Clause, Article III, the Rules Enabling Act, and Rule 23, and raise substantial and material Constitutional and non-bankruptcy federal law issues.  Under 28 U.S.C. § 157(d), these important Constitutional and non-bankruptcy federal law questions should be decided by a district court, making withdrawal mandatory.[24]  *See Picard*, 463 B.R. at 288 n.3 ("If mandatory withdrawal protects litigants' constitutional interest in having Article III courts interpret federal statutes that implicate the regulation of interstate commerce, then it should also protect, a fortiori, litigants' interest in having the Article III courts interpret the Constitution.  This conclusion follows from the Constitution, if not from 28 U.S.C. § 157 itself.") (citing *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 83–84 (1982)); *see also LightSquared Inc*, 2014 WL 345270, at *4 (The "determination of whether Noerr–Pennington [doctrine] applies to [plaintiff's state law claims] would require 'significant,' rather than 'simple,' interpretation of

---

[24]   In addition to the issues discussed in this Part I, the Rule 23 Motion raises additional issues under the Constitution and other non-bankruptcy law that would justify mandatory withdrawal, as well as permissive withdrawal, as discussed in Part II.

federal law") (citation omitted).

A.    **The Proposed Settlement Requires Adjudication of Substantial Non-Bankruptcy Issues Under *Ortiz*, *Amchem*, Rule 23, and the Due Process Clause, Mandating Withdrawal of the Reference.**

In *Ortiz v. Fibreboard Corp.*, the Supreme Court reversed certification of a non-opt-out limited fund settlement class that, like the proposed settlement in this case, purported to settle unliquidated claims for monetary relief.  527 U.S. 815 (1999).  The Court held that the settlement class failed to meet the requirements of Rule 23(b)(1)(B), which—in order to avoid "serious constitutional concerns that come with any attempt to aggregate individual tort claims on a limited fund rationale" with no opt-out right—requires three elements characteristic of the historic model of a mandatory limited fund class:

(1) "the totals of the aggregated **liquidated** claims and the fund available for satisfying them, set definitely at their maximums, demonstrates the inadequacy of the fund to pay all the claims";

(2) "the whole of the inadequate fund [is] to be devoted to the overwhelming claims"; and

(3) "the claimants identified by a common theory of recovery [are] treated equitably among themselves."

*Id.* at 845, 873 (emphasis added).

As in *Ortiz*, the proposed settlement in this case fails all three requirements for a Rule 23(B)(1)(b) limited fund class.

*First*, the claims of the putative class members here are not "liquidated," thus raising the "serious constitutional" issues recognized by the Supreme Court in *Ortiz.  See also* 1 *McLaughlin on Class Actions* § 5:10.  Indeed, *Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 328–29 (N.D. Tex. 2011), cited throughout Plaintiffs' Rule 23 motion (Rule 23 Mot. at 33-39), underscores this point:

The Court thus focuses its attention on the first *Ortiz* factor of whether the totals of

18

the aggregated *liquidated* claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims.  The Court must first consider whether the Representative Plaintiff has demonstrated the total *liquidated* amount of the claims and the total amount of the purported 'limited fund.'  Many courts have been reluctant to utilize the 'limited fund' device when the claimants have claims for unknown and *unliquidated* amounts of damages.  *See Ortiz*, 527 U.S. at 850, 119 S.Ct. 2295; *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 193–94 (5th Cir. 2010) (rejecting a proposed 'limited fund' settlement when '[t]he class members in this case suffered a wide variety of injuries, ranging from property damage to personal injury and death, and no method is specified for how these different claimants will be treated vis-a-vis each other'); *Klein v. O'Neal*, 2006 WL 325766, at *4-*5  (N.D. Tex. Feb. 13, 2006) (holding that first *Ortiz* requirement not met in products liability claim relating to intravenous pharmaceutical product when the damages figures were estimated).

However, unlike what has been seen in mass tort cases such as *Katrina* or *Klein*, the amount of losses in this case is known and ascertainable, as each class member can *easily determine the amount of his or her investment that was lost* as a result of the collapse of Provident.

*Stott*, 277 F.R.D. at 328–29 (emphasis added).

*Second*, the proposed settlement does not and cannot establish that "the whole of the inadequate fund [is] to be devoted to the overwhelming claims."  *Ortiz*, 527 U.S. at 839.  Movants define the "limited fund" as consisting, by agreement, solely of the Adjustment Shares and *excluding* the GUC Trust's $450 million-plus in net assets.[25]  But a "limited fund" cannot be defined by the parties' agreement.  *See Ortiz*, 527 U.S. at 821, 839 ("limited fund" under Rule 23(b)(1)(B) does not apply where the available funds are limited only by agreement of the parties; "the whole of the inadequate fund [is] to be devoted to the overwhelming claims"); *In re Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Products Liab. Litig.*, 221 F.3d 870, 882 (6th Cir. 2000) (holding that the fund must include all potential sources of relief, including companies against whom plaintiffs may have possible alter ego claims).  The bar against creating

---

[25]   Under the proposed settlement agreement, the GUC Trust would pay no more than $13.72 million in notice costs, but pay nothing with respect to the alleged limited fund.  (Rule 23 Mot. at 4.)

a limited fund by agreement is rooted in Constitutional principles. *Ortiz* found that courts could not "deny[] any opportunity for withdrawal of class members whose jury trial rights will be compromised, whose damages will be capped, and whose payments will be delayed" without "assurance that claimants are receiving the maximum fund, not a potentially significant fraction less" *Ortiz*, 527 U.S. at 860, 863.

Relatedly, the proposed classes include economic loss plaintiffs, but omit personal injury/wrongful death plaintiffs, GUC Trust unitholders, and any other party with claims against the GUC Trust.  (Rule 23 Mot. ¶ 41.)  Thus, in violation of *Ortiz*, the proposed classes fail to include "all those with claims" against the GUC Trust "unsatisfied at the time of settlement negotiations."  *See Ortiz*, 527 U.S. at 864-65 ("Assuming, arguendo, that a mandatory, limited fund rationale could under some circumstances be applied to a settlement class of tort claimants, it would be essential that the fund be shown to be limited independently of the agreement of the parties to the action, ***and equally essential under Rules 23(a) and (b)(1)(B) that the class include all those with claims unsatisfied at the time of the settlement negotiations***") (emphasis added).[26] Making matters worse, although personal injury/wrongful death plaintiffs are ***excluded*** from the proposed class, under Movants' proposal, they would make claims against and receive payments from the proposed "limited fund."   (Rule 23 Mot. ¶ 148 (discussing future allocation of the settlement fund between the proposed classes and personal injury/wrongful death plaintiffs).) Movants cite no precedent permitting non-class members to benefit from a Rule 23(b)(1)(B) class limited fund.

---

[26]   *See also In re Motors Liquidation Co.*, 447 B.R. 150, 162 n.53 (S.D.N.Y. 2011) ("I don't think that a limited fund rationale would justify certification under Rule 23(b)(1) here.  Old GM's available value is, of course, limited, but the claim to that 'limited fund' isn't limited to the putative class action claimants.  Old GM has a large number of other creditors who likewise have claims against Old GM's assets.  The 'limited fund' thus isn't to be shared solely amongst class action claimants, but instead must be shared by all of Old GM's creditors.").

*Third*, the proposed settlement cannot establish that "the claimants identified by a common theory of recovery [are] treated equitably among themselves." *Ortiz*, 527 U.S. at 839.  Movants fail to identify a "common theory of recovery."  *Ortiz*, 527 U.S. at 839.  Instead, Movants' proposed Non-Ignition Switch class includes five different recalls with no subclasses.  The recalls lumped into this one class include the Electronic Power Steering Recall, the Lambda Side Impact Airbag Recall, and various Key Rotation Recalls.  They involve different alleged defects, model vehicles, recalls, and fixes.  Some of the recalls involve key rotation, but some do not.  Some of the recalls involve airbag non-deployment, but others do not.  Nonetheless, Movants ask the Bankruptcy Court to determine that all plaintiffs asserting claims under these different recalls have a "common theory of recovery."

Nor do Movants demonstrate that putative class members will be "treated equitably," as *Ortiz* requires, *id.* at 839, or will "likely" receive "fair, adequate, and reasonable" relief, as required by Rule 23(e)(2).  Under the proposed settlement, the sole source of potential relief for the proposed class and actual and potential personal injury plaintiffs are the Adjustment Shares.  (Rule 23 Mot. Exhibit D.)  But Movants acknowledge that the proposed settlement may not result in the issuance of **any** Adjustment Shares.  *Id.*  Nonetheless, the proposed settlement would require class members and personal injury plaintiffs to forever waive and release their claims against the GUC Trust **before** knowing:  (i) whether the Adjustment Shares provision can or will ever be triggered; (ii) whether they would be eligible to make a claim for compensation from the Adjustment Shares; or (iii) whether, even if they were to make a claim, they would receive any compensation from the Adjustment Shares.  Under Movants' proposal, those issues would all be deferred until after the proposed classes are finally certified and the settlement is finally approved.  But Movants' proposal to deal with these issues at the estimation and allocation stages is prohibited by the Supreme

Court's decisions in *Ortiz* and *Amchem*.[27]

In sum, Plaintiffs' proposed use of non-opt out classes involving unliquidated monetary damages and an undetermined limited fund raises precisely the "serious constitutional concerns that come with any attempt to aggregate individual tort claims on a limited fund rationale" described by the Supreme Court. *See Ortiz*, 527 U.S. at 845. In *Ortiz*, the Court, following the doctrine of Constitutional avoidance, did not explicitly rule out such a class, but cautioned that it would implicate absent class members' Seventh Amendment right to a jury trial and their Due Process right to their own "day in court":

> "First, the certification of a mandatory class followed by settlement of its action for money damages obviously implicates the Seventh Amendment jury trial rights of absent class members."
>  . . .
>
> Second, "mandatory class actions aggregating damages claims implicate the due process 'principle of general application in Anglo–American jurisprudence that one is not bound by a judgment in personam in a litigation in 'which he is not designated as a party or to which he has not been made a party by service of process.'"
>  . . .
>
> "The inherent tension between representative suits and the day-in-court ideal is only magnified if applied to damages claims gathered in a mandatory class."

*Ortiz*, 527 U.S. at 845-46.

The Supreme Court had earlier "raised the flag on [this Due Process] issue" in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985), which held that an absent class member's claim to individual monetary relief could not be extinguished in a mandatory class. *See Ortiz*, 527 U.S.

---

[27]  *See In re Katrina Canal Breaches Litig.*, 628 F.3d at 193–94 ("the settlement provides for the appointment of a special master to 'provide to the Court a recommended disposition and protocol with regard to the remaining [settlement fund], and treatment of Claims of Class members.' This arrangement simply punts the difficult question of equitable distribution from the court to the special master, without providing any more clarity as to how fairness will be achieved. The lack of any 'procedures to resolve the difficult issues of treating such differently situated claimants with fairness as among themselves,' *id.* at 856, 119 S.Ct. 2295, leads us to reverse the district court's order certifying this class.") (alterations in original).

at 847-48 (discussing *Shutts*). [28]   Movants' alternative proposal to settle their individual unliquidated claims for monetary relief under Rule 23(b)(1)(A) presents the same Due Process issues as a limited fund class under Rule 23(b)(1)(B).  *See* 2 *Newberg on Class Actions* § 4:4 (5th ed. Nov. 2018 Update) ("Because the so-called mandatory nature of (b)(1) classes clashes with the Due Process Clause's requirement that notice and opt out rights accompany cases primarily for monetary damages, individual money damages are generally unavailable in (b)(1) class actions."); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) (holding that claims for individual monetary relief could not be brought in a mandatory Rule 23(b)(2) class, but must be brought under Rule 23(b)(3)); *In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2017 WL 1273963, at *13 (S.D.N.Y. Mar. 31, 2017) (individualized monetary claims belong in a Rule 23(b)(3) class). [29]

Courts since *Ortiz* have strictly enforced the three elements described in that case. [30] Plaintiffs cite no published case certifying, post-*Ortiz*, a Rule 23(b)(1)(B) class of aggregated, unliquidated individual damages claims like those at issue here. [31]  To certify the proposed limited

---

[28]   In *Shutts*, the court rejected the Kansas Supreme Court's "common fund" justification for mandatory certification, holding that, as in this case, there is no identifiable "res" or "limited amount" that might be depleted:  "Only by somehow aggregating all the separate claims in this case could a 'common fund' in any sense be created, and the term becomes all but meaningless when used in such an expansive sense."  *Shutts*, 472 U.S. at 819-20.

[29]   *Compare Moreno v. Deutsche Bank Americas Holding Corp.*, 2017 WL 3868803, at *9 (S.D.N.Y. Sept. 5, 2017) ("Defendants' reliance on *Wal-Mart*—which held that Rule 23(b)(2) does not permit the combination of 'individualized awards of monetary damages' and classwide relief—is misplaced.  In contrast to the claims in *Wal-Mart*, Plaintiffs' class claims under Rule 23(b)(1) are **derivative** in nature, not individualized.") (emphasis added) (internal citation omitted).  Unlike the individual economic loss claims at issue in this case, *Moreno* concerned claims that were *derivative* of a claim for damages to another entity, such as an ERISA plan.

[30]   *See, e.g.*, *In re Telectronics*, 221 F.3d at 882; *In re Katrina Canal Breaches Litig.*, 628 F.3d at 193-94.

[31]   Plaintiffs cite *dicta* in a footnote in *Doe v. Karadzic*, 192 F.R.D. 133, 141 n.11 (S.D.N.Y. 2000), regarding a "reasonable method" for estimating damages (Rule 23 Mot. ¶ 107), but that case is irrelevant and distinguishable.  First, *Karadzic* denied class certification.  192 F.R.D. at 145 ("Rule 23(b)(1)(B) certification cannot be adequately justified on the current record.").  Second, the need for liquidated claims was not briefed by the parties in *Karadzic*.  *See id.* at 141 n.11 ("Although the parties have not raised this issue, the instant case departs from the traditional limited fund model in that, not unlike the typical mass tort case, there are no liquidated claims."). Third, the *Karadzic* court noted that although "[t]he [*Ortiz*] Court ostensibly left for another day the question of whether this subdivision may ever be used to aggregate individual tort claims," "[n]evertheless, its requirement of strict adherence to the traditional limited fund model may have sounded the death knell for mass tort suits under Rule 23(b)(1)(B)."  *Id.* at n.10.  Fourth, even assuming *arguendo* that post-*Ortiz* published decisions *had* certified Federal Rule 23 limited fund classes using a "reasonable" method to estimate unliquidated damages, the *In re Diet Drugs* case cited in *Karadzic* indicates that such a method is particularly improper in circumstances not

fund classes in this case, the court would have to confront the "serious constitutional concerns" that Plaintiffs' proposed mandatory classes present, necessitating withdrawal under 28 U.S.C. § 157(d).

### B. The Proposed Settlement Requires Adjudication of Whether the Due Process Clause Requires Separate Class Representatives and Counsel to Represent Plaintiffs With Conflicting Interests, Mandating Withdrawal of the Reference.

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. Adequate representation is also specifically necessary under Rule 23(e)(2)(A) for class settlements. *See Ortiz*, 527 U.S. at 848 n.24 (noting "the constitutional requirement articulated in *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), that 'the named plaintiff at all times adequately represent the interests of the absent class members.'") (quoting *Shutts*, 472 U.S. at 812). Plaintiffs' proposed settlement agreement purports to identify class representatives in "Schedule 3," but in fact no class representatives are identified in that Schedule or elsewhere in the agreement or in Plaintiffs' Rule 23 Motion. (*See* Settlement § 2.67 and Schedule 3 thereto.) Because they have failed to identify class representatives, Plaintiffs cannot establish that the interests of differently situated class members are adequately represented. *See Amchem*, 521 U.S. at 627 (reversing class

---

involving "jury verdicts" and "white-knuckle settlements." *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, 1999 WL 782560, at *1 (E.D. Pa. Sept. 27, 1999) (declining to certify class where "[t]here has been only one jury verdict rendered to date and no arms length, 'white-knuckle' or 'down to the wire' settlements of individual cases with Interneuron."). But there have been no such "jury verdicts" or "white-knuckle settlements" with respect to the economic loss claims here. To the contrary, Boedeker's "median" damages estimates in his GUC Trust Report vary wildly from "$88 to $8094" per vehicle. (05/09/2017 Boedeker GUC Trust Report at 33.) Using Boedeker's estimate of 11.96 million vehicles in his GUC Trust Report would result in between $1 billion and $96 billion in alleged damages—an enormous range and the antithesis of a "liquidated" amount. In any event, both *Karadzic* and *In re Diet Drugs* underscore the serious constitutional issues associated with certifying a non-opt class involving unliquidated monetary damages claims. Plaintiffs also cite a district court decision affirmed in *Juris v. Inamed Corp.*, 685 F.3d 1294 (11th Cir. 2012), but that case involved a Rule 60(b) challenge to a class certified prior to *Ortiz*. *Id.* at n.45 ("the propriety *vel non* of Judge Pointer's Rule 23(b)(1)(B) certification is an issue which is not before us."). And *Jane Doe 30's Mother v. Bradley*, 64 A.3d 379, 384 n.9 (Del. Super. Ct. 2012), also cited by Movants, involved application of Delaware Superior Court Civil Rule 23, not Federal Rule 23. (Rule 23 Mot. at 37.)

settlement where "[t]he settling parties . . . achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected.); *see also Ortiz*, 527 U.S. at 848 n.24 ("In this case, of course, the named representatives were not even "named [until] after the agreement in principle was reached, . . . and they then relied on class counsel in subsequent settlement negotiations").

The hybrid economic loss-personal injury settlement in this case includes two separate classes—for Ignition-Switch and Non-Ignition Switch Plaintiffs—but it was negotiated by counsel purportedly representing both classes and all class members. For this reason alone, Movants' Rule 23 Motion is infected with significant Constitutional problems. *See*, *e.g.*, *Ortiz*, 527 U.S. at 848 n.24; *Amchem*, 521 U.S. at 627. Movants do not disclose, for example, how the purported unitary relief negotiated by counsel jointly representing both classes will be divided between the two classes (or how sharing the settlement fund with personal injury/wrongful death plaintiffs and potential plaintiffs benefits the classes). While the Rule 23 Motion acknowledges the necessity of additional subclasses representing parties with different interests under the proposed settlement,[32] Movants inexplicably propose creating sub-classes at the allocation phase, *after* the class is certified and the proposed settlement is finally approved. (Rule 23 Mot. ¶ 117.) Where, as here, differences among plaintiffs (and differences in state laws) require sub-classes, each sub-class should be represented, ***during the negotiations***, by separate class representatives and separate counsel. *See In re Literary Works in Elec. Databases Copyright Litig*, 654 F.3d 242, 252 (2d Cir. 2011) ("[o]nly the creation of subclasses, and the advocacy of an attorney representing each subclass, can ensure that the interests of that particular subgroup are in fact adequately represented.").

---

[32] In the MDL, plaintiffs propose different classes corresponding to each recall. (Dkt. No. 5646, Pls.' Mot. for Class Certification.)

The very decision to settle Ignition Switch and Non-Ignition Switch claims raises conflicts. The Ignition Switch Plaintiffs, for example, who have already established a Due Process violation with respect to the bankruptcy sale notice, and in May 2014 received a tolling agreement to file late claims, may have preferred to take their chances in establishing the right to file a late claim and to pursue the GUC Trust's existing assets, instead of taking the chance that Plaintiffs' claims may be in excess of $3 billion and thus sufficient to trigger the Adjustment Shares. *See also Amchem*, 521 U.S. at 627 ("[W]e know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups. . . . [T]he members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups.") (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 742–743 (2d Cir. 1992), *modified on reh'g sub nom. In re Findley*, 993 F.2d 7 (2d Cir. 1993)).

Moreover, unlike in the MDL, Movants seek to certify nationwide classes implicating the laws of 51 jurisdictions. They do not propose to use state-by-state sub-classes at ***any*** stage. This omission precludes Movants from meeting the requirements of Rule 23(a)(3) (typicality), Rule 23 (a)(4) (adequacy of representation), or the "common theory" requirement of *Ortiz. See Ortiz*, 527 U.S. at 841, 845; *see Smith v. MCI Worldcom, Inc.*, 2000 WL 36726436, at *8 (N.D. Okla. Mar. 31, 2000) (holding that differences in state law defeated typicality and adequacy of representation under Rule 23(a)).

In sum, the Rule 23 Motion, the success of which depends on novel interpretations of the Due Process Clause, requires substantial and material consideration of non-bankruptcy law, and therefore should be withdrawn under 28 U.S.C. § 157(d).

### C. The Proposed Settlement Requires Adjudication of Constitutional and Non-Bankruptcy Issues Relating to Whether Plaintiffs With No Injury Can Recover, Mandating Withdrawal of the Reference.

Plaintiffs state in their Rule 23 Motion that they will rely on Stephan Boedeker to establish alleged class-wide damages.  However, Plaintiffs did not submit to the Bankruptcy Court any report or data establishing the claimed damages of any actual member of the purported classes (or any personal injury/wrongful death plaintiff), and instead appear to rely on materials submitted to this Court.  Assuming Boedeker's analysis in this case matches his MDL analysis, Boedeker's own "conjoint" survey, if accepted, demonstrates that between 26.6% to 39.1% percent of respondents have no injury, and those with a purported injury have wildly differing alleged damages.  *See* Dkt. No. 6132 (New GM's Resp. to MDL Pls.' Mot. for Class Certification) at 24-36 (addressing this issue in greater detail).  Indeed, New GM and its experts have presented proof from Boedeker's raw data that millions of putative class members in fact have no injury and damages at all.  *Id.*

Certifying a class that includes, according to Plaintiffs' estimates, millions of alleged class members with no injury would violate Article III and the Due Process Clause (as well as the Rules Enabling Act and Rule 23).  Article III requires injury in fact.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).[33]  Accordingly, "the class must therefore be defined in such a way that anyone within it would have standing" and "no class may be certified that contains members lacking Article III standing."  *Denney v. Deutsche Bank AG*, 443 F. 3d 253, 264 (2d Cir. 2006); s*ee also Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (no certification if plaintiff lacks "common evidence to show all class members suffered some injury"); *In re Asalcol Antitrust Litig.*, 907 F.3d 42, 15 (2018) (reversing class certification where "approximately ten percent of the class had not suffered any injury attributable to defendants' allegedly anticompetitive

---

[33]  "[P]arties cannot either waive or confer standing by agreement."  *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 103 (S.D.N.Y. 1997).

behavior"); *Opperman v. Path, Inc.*, 2016 WL 3844326, at *14 (N.D. Cal. July 16, 2016) (rejecting a conjoint survey: "No damages number arising from this model will apply to all class members, particularly since some of the class members, by this measure, will not have been injured at all."). Nor may a class be certified where, as here, individual person-by-person inquiry is necessary to determine whether a proposed class member has an injury in fact.

In *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1050 (2016), the Supreme Court stated that "the question whether uninjured class members may recover is one of great importance," but declined to address the issue, concluding that the question was premature given the record in that case. In a concurring opinion, Chief Justice Roberts agreed that the issue was not ripe and should be decided by the District Court in the first instance, but cautioned that:

> Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not. The Judiciary's role is limited "to provid[ing] relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm." . . . Therefore, if there is no way to ensure that the jury's damages award goes only to injured class members, that award cannot stand.

*Id.* (Roberts, C.J., concurring).

New GM has briefed this precise issue in this Court. (Dkt No. 6132 at 24-32.) For purposes of this motion, the point is that this Court is best positioned to decide this Constitutional issue of "great importance," especially when the issue is already before it. It cannot be, as Movants suggest, postponed until the estimation proceedings, at which time the classes will have already been noticed and certified, and the release will have been approved. Article III is a threshold issue that must be resolved first, before anything else.[34]

---

[34] The Constitutional and other issues raised in this motion are nothing like the ones in plaintiffs' 2015 motion to withdraw the reference, which concerned application and interpretation of the Bankruptcy Court's Sale Order and Injunction. *See In re Motors Liquidation Co.*, 538 B.R. 656 (S.D.N.Y. 2015). In that motion, plaintiffs argued that "[p]roceedings that require substantial consideration of constitutional law must be withdrawn," Bankr. Dkt. No. 13251, but this Court held that the question whether plaintiffs had an adequate opportunity to be heard on application of the Sale Order and Injunction to their claims was "not particularly novel" and "well within the ken

In short, the Rule 23 Motion requires consideration of significant issues of Constitutional and federal non-bankruptcy law.  Withdrawal of the reference is therefore mandatory under 28 U.S.C. § 157(d).  *See Picard*, LLC, 463 B.R. at 288 n.3.

## II.   THE COURT SHOULD PERMISSIVELY WITHDRAW THE REFERENCE FOR CAUSE.

Separate and independent from mandatory withdrawal, good cause exists for permissive withdrawal under 28 U.S.C. § 157(d).  The claims against the GUC Trust included in the proposed settlement overlap with the claims against New GM in the MDL.  They include many of the same proposed class members (*see* n.11, *supra*), the same counsel, many of the same vehicles and alleged defects, six of the same recalls, the same recall fixes, the same causes of actions, the same expert proofs, many of the same personal injury/wrongful death plaintiffs, and the same dispositive *Daubert* and summary judgment issues.  Given this tremendous overlap, withdrawal of the reference will result in the most efficient use of judicial resources.  *See, e.g., 1800Postcards, Inc. v. Morel*, 153 F. Supp. 2d 359, 367 (S.D.N.Y. 2001) (finding that where facts, transactions and issues underlying creditors' committee's complaint overlap with non-core claims pending in District Court, "efficiency counsels withdrawing the referral of the committee's claims"); *Mishkin v. Ageloff*, 220 B.R. 784, 800 (S.D.N.Y. 1998) (withdrawing reference of "overlapping and interlocking" core proceedings).

Indeed, permissive withdrawal of the overlapping claims is particularly appropriate because this Court has been charged with the "unique responsibility" of overseeing the MDL proceeding.  *See In re Parmalat Finanziaria S.p.A.*, 320 B.R. 46, 50–51 (S.D.N.Y. 2005) (the

---

of the Bankruptcy Court." 538 B.R. at 662 (internal citations omitted).  By contrast, the issues raised in this motion have little, if anything, to do with bankruptcy law or interpretation of the Bankruptcy Court's orders, and instead concern, for example, an unprecedented use of a mandatory class to extinguish the rights of unrepresented parties not before the court, involving significant Constitutional issues.

existence of the MDL proceedings constitutes a "higher interest" that justifies withdrawal, even of core proceedings); *see also In re Ephedra Prod. Liab. Litig.*, 329 B.R. 1, 4 n.1 (S.D.N.Y. 2005). In this MDL role, the Court has developed a deep familiarity with the issues and is presently considering extensive briefing relating to the same issues presented by the proposed settlement. Withdrawal promotes the interest in judicial economy that is the very purpose of MDL proceedings:   it "will eliminate duplicative discovery; prevent inconsistent pretrial rulings, including with respect to class certification; and conserve the resources of the parties, their counsel, and the judiciary."  (J.P.M.L. Dkt. No. 266, June 9, 2014 Transfer Order at 3); *see In re Parmalat Finanziaria S.p.A.*, 320 B.R. at 50–51; *see also In re Ephedra Prod. Liab. Litig.*, 329 B.R. at 4 n.1 (withdrawing consumer class actions because of the "close relation of these class actions [in the bankruptcy court] to the [MDL] ephedra products liability cases to be tried in the district court").

In *In re Orion Pictures Corp.*, the Second Circuit described the considerations relevant in determining whether there is "cause" to withdraw the reference, including:  "whether the claim or proceeding is 'core' or 'non-core' [*i.e.,* whether review in the district court would be *de novo*], whether it is legal or equitable, and considerations of efficiency, prevention of forum shopping, and uniformity in the administration of bankruptcy law."   4 F.3d 1095, 1101 (2d Cir. 1993). Application of these factors is not a straightforward mechanical exercise, but an analysis that relies on the District Court's "discretion."  *In re Dana Corp.*, 379 B.R. 449, 454 (S.D.N.Y. 2007).  "[T]he critical question is efficiency and uniformity." *See Mishkin v. Ageloff*, 220 B.R. 784, 800 (S.D.N.Y. 1998) (citing *Orion*, 4 F.3d at 1100).  Here, withdrawing the reference achieves these objectives.

## A.    Withdrawal of the Reference Promotes Judicial Economy.

Where, as here, the claims in the Bankruptcy Court involve issues identical to those before the District Court, "concerns of judicial efficiency" constitute a "higher interest" justifying withdrawal, even of core matters.  *In re G.M. Crocetti, Inc.*, 2008 WL 4601278, at *5 (S.D.N.Y.

Oct. 15, 2008) ("Failure to withdraw the reference in this case would subject the parties to the risk of inconsistent verdicts on these issues, not to mention significant inefficiency and expense from having to duplicate efforts and litigate the same issues twice.").

Given the substantial overlap between the proposed settlement and the MDL proceedings in this Court, withdrawal of the reference will result in the most efficient use of judicial resources. *See In re Motors Liquidation Co.*, 538 B.R. at 663 (citing "judicial efficiency" as a "higher interest" that may warrant withdrawal of the reference, but declining to withdraw the reference because Judge Gerber was already "fully versed" in the underlying issues that plaintiffs previously sought to withdraw from the Bankruptcy Court); *see also In re Parmalat Finanziaria S.p.A.*, 320 B.R. at 50–51 (S.D.N.Y. 2005); *In re Ephedra Prod. Liab. Litig.*, 329 B.R. at 4 n.1.

This overlap includes, for example:

- <u>Overlapping Class Certification Issues</u>.  Plaintiffs seek class certification in both the Bankruptcy Court and the MDL Court, requiring both courts to determine whether, for example:  (a) there are questions of law or fact common to the class, as required under Rule 23(a)(2); (b) the named plaintiffs are typical of the potentially millions of class members in the putative classes, as required under Rule 23(a)(3); (c) the named plaintiffs are adequate representatives under Rule 23(a)(4); and (d) under Rule 23, Article III, and the Rules Enabling Act, the proposed classes may include any putative class members that lack an injury-in-fact or legally cognizable claim.

- <u>Overlapping Putative Economic Loss Classes</u>.  The putative Delta Ignition Switch class included in the proposed settlement overlaps with the putative Delta Ignition Switch class in the MDL.  *Compare* Rule 23 Mot. ¶ 41 ("plaintiffs asserting economic loss claims who, prior to July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047") *with* 5ACC ¶ 34 (general definition of class includes "All persons who bought or leased (i) a Delta Ignition Switch Vehicle on or before February 14, 2014 . . . .").

- <u>Overlap With Respect to Successor Liability Claims</u>.  The Ignition Switch Plaintiffs must establish Old GM's liability to prevail on both (i) claims against the GUC Trust and (ii) their successor liability claims against New GM.

- <u>Overlapping Recalls</u>.  The proposed settlement involves recalls at issue in the MDL economic loss litigation:  (i) MDL Delta Ignition Switch (14-V-047); (ii) Lacrosse / Impala Slotted Key (14-V-355); (iii) CTS / SRX Key Bump & Inadvertent

Rotation (14-V-394); (iv) Malibu / Impala Inadvertent Key Rotation (14-V-400); (v) SIAB Wiring Harness (14v118); and (vi) Electric Power Steering Assist (14v153).[35]

- Overlapping Personal Injury Claimants. The proposed settlement includes 442 Pre-Sale Accident Plaintiffs expressly named in the agreement. Of these, 152 are already eligible for settlements as a result of agreements in principle reached by their lawyers and New GM (with 86 of those plaintiffs also currently having claims in this Court). Of the remaining 290 named in the agreement, 245 filed or attempted to file proofs of claims in the Bankruptcy Court, and 136 of these have also filed claims in the MDL.[36] The proposed settlement purports to include all unasserted personal injury/wrongful death claims, whether or not individuals filed claims in the Bankruptcy Court. See pp. 10-12, supra.

- Overlap With Respect to the Run-Accessory-Run Theory. In December 2017, this Court ruled that the proposed expert opinions supporting Co-Lead Counsel's "run-accessory-run" theory—for personal injury/wrongful death plaintiffs involved in accidents in which their airbags had deployed—were inadmissible under Daubert. In re General Motors LLC Ignition Switch Litig., Dkt. No. 4905. To the extent individuals asserting run-accessory-run theories are included among the personal injury/wrongful death claimants, this ruling should preclude those claims from being considered in connection with the proposed settlement.

- Overlapping Expert Report Issues. Stefan Boedeker's reports form the basis for Plaintiffs' calculation of purported economic loss damages in both the MDL and the proposed settlement. See Rule 23 Mot. ¶ 38. This Court is considering New GM's Daubert motion to exclude Boedeker's opinions, will also determine whether his claimed damages are even legally cognizable and measurable on a class-wide basis, and whether Plaintiffs in the proposed settlement can establish damages.

- Overlapping Economic Loss Factual Issues. The overlapping factual issues include Plaintiffs' particular experiences (or not) of a defect, what assertions were allegedly made about Plaintiffs' vehicles, whether Plaintiffs relied on those alleged assertions, and whether Plaintiffs sold their vehicles before any recall. This Court has applied and continues to apply its legal rulings to the factual circumstances of specific plaintiffs.

- Overlapping Service Parts Recall Issue. Over 800,000 vehicles included in the proposed settlement are subject to the Service Parts Recall. See New GM's March 28, 2014 573 Letter to the National Highway Traffic Safety Administration. These

---

[35] The Camaro Ignition Key Bump (14v346) recall, which only involves New GM vehicles, is at issue in the MDL but is not part of the proposed settlement.

[36] See n.18, supra; see also Settlement § 2.56 ("2.56 Proofs of Claim means the late proofs of claim, including late class proofs of claim, that the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs sought authority to file pursuant to the Late Claims Motions and the Supplemental Late Claims Motion, and any amendments thereto filed prior to the execution of this Agreement.").

vehicles do not contain a defective ignition switch, unless one was installed while the vehicle was being serviced.  This Court held that "if [the owners of these vehicles] are ultimately to succeed on their claims with respect to the ignition switch, they will have to show that their cars in fact contained that defect."  *In re General Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *20 n.15 (S.D.N.Y. July 15, 2016).  The proposed settlement includes the purported damages of vehicle owners included in the Service Parts Recall who have not proved that they received a defective replacement ignition switch.

- Overlapping Causes of Action.  The proposed economic loss class proofs of claim include the same causes of action asserted in the MDL, including:  (i) fraudulent concealment; (ii) unjust enrichment; (iii) consumer protection claims; (iv) breach of the implied warranty of merchantability; and (v) negligence.  (Rule 23 Mot. ¶ 35; 5ACC at 3-4.)  These overlapping claims raise exactly the same legal issues being addressed in the MDL.  This Court has already made rulings rejecting many of these claims under the laws of different states.  (*See* n.37, *infra*.)

### 1)    The Reference Should Be Withdrawn to Prevent Simultaneous and Inefficient Class Proceedings in the Bankruptcy Court and This Court.

Under amended Rule 23(e), to obtain preliminary certification, Movants must "show[] that the court will likely be able to" find that the parties have met the requirements of Rule 23(a), Rule 23(b)(1)(A) or Rule 23(b)(1)(B) (including the requirements set forth by the Supreme Court in *Ortiz*), and Rule 23(e).  *Ortiz* holds (among other things) that a limited fund can only be certified if "the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims" and that "claimants identified by a common theory of recovery" are "treated equitably among themselves."  *Ortiz*, 527 U.S. at 838-39.  Determining that these requirements are "likely" satisfied under Rule 23(e) for purposes of Movants' proposed Preliminary Approval Order necessarily requires consideration of issues already before this Court.  For example,

- As Movants concede, "the key rulings on economic loss claims for each state that have been rendered by Judge Furman in the MDL Action have been and will continue to be taken in to account by the Settlement Parties when we get to the estimation phase"—when the claims will be liquidated.  (Bankr. Dkt. No. 14424.)

- The liquidated amount of Plaintiffs' claims, which then dictates the value of any so-

called "limited fund," depends entirely on whether Boedeker's conjoint survey methodology is admissible and, even if so, whether it calculates legally cognizable damages capable of being calculated on a class-wide basis, issues this Court will decide. These issues cannot be deferred because they are necessary to determine whether any proposed class can be certified and notice can issue.

- Limited fund class certification aims to equitably distribute a limited fund on a *pro rata* basis. *See Ortiz*, 527 U.S. at 864. Here, Movants seek certification of two nationwide classes, implicating the laws of 51 jurisdictions. Thus, to determine whether class members are treated equitably, the court would have to canvass the laws of 51 jurisdictions as well as the facts relating to six different Recalls involving approximately 120 different vehicle make and model years. This Court has already identified distinctions among various state laws that effectively required the MDL Plaintiffs to pursue statewide classes for the Bellwether States, has dismissed the nationwide RICO claim, and has dismissed a variety of claims under the laws of different states.[37] This Court should similarly review these exact same issues that are implicated by the proposed settlement.

- Movants have not identified any proposed class representatives. To the extent Movants identify as class representatives individuals who are named plaintiffs in the proposed class proofs of claim previously filed in the Bankruptcy Court, many of those individuals are also proposed class representatives in this MDL. In this Court, New GM has argued that such individuals are subject to unique defenses or otherwise assert claims that are not typical of the proposed statewide classes. A ruling from this Court that any of the individuals who are proposed class representatives here cannot adequately represent the MDL classes would apply equally to the proposed settlement.

- The alleged Non-Ignition Switch settlement class includes owners of vehicles subject to five different Recalls affecting dozens of different vehicle models. These include the Electronic Power Steering Recall (14v-153), the Side Impact Airbag Recall (14v-118), and the Key Rotation Recalls (14v-355, 14v-394, 14v-400, and 14v-540). Movants identify no legally sufficient issues of law or fact common to the Non-Ignition Switch class. That should come as no surprise because, whereas Movants have placed all Non-Ignition Switch Recalls into one class for purposes of the proposed settlement, the MDL

---

[37]   *See In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *35-37 (S.D.N.Y. July 15, 2016) (dismissing brand devaluation theory; RICO claim; certain claims of Missouri and Oklahoma plaintiffs who lack a manifest defect; Florida fraudulent concealment claims based on economic loss rule; Louisiana claims of plaintiffs with New GM vehicles based on Louisiana Products Liability Act; and various unjust enrichment claims based on a written warranty or adequate remedy at law*); In re Gen. Motors, LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 430, 451-52 (S.D.N.Y. 2017) (dismissing claims of New York and Texas plaintiffs, and certain claims of Pennsylvania plaintiffs, who lack a manifest defect; Wisconsin fraudulent concealment claims based on economic loss rule; Texas and Michigan fraud claims for lack of a duty to disclose; and various unjust enrichment claims based on a written warranty or adequate remedy at law; also confirming dismissal of brand devaluation claims; and holding that plaintiffs who disposed of their vehicles before the recall announcements lack diminished value damages); *In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262, 343-46 (S.D.N.Y 2018) (holding that overwhelming majority of states hold that "lost time" damages are the equivalent of lost earnings or income; holding that various unjust enrichment claims are barred by a written warranty or adequate remedy at law; holding in accord with parties' agreement that six additional states require a manifest defect to state a claim).

Plaintiffs have sought different classes for each recall. This Court will rule on the propriety of those classes, which rulings will need to be taken into account in the proposed settlement.

Movants concede that this Court's rulings may affect "the size, scope or composition of the classes" and lead to "refined estimates of the amount of damages" (Settlement § 4.5; Rule 23 Mot. ¶ 40); that "[e]xtensive discovery regarding the Plaintiffs' claims has been completed in the MDL Action" (*id.* ¶ 53); that Co-Lead Counsel's alleged adequacy to serve as lawyers for the proposed settlement classes is based on their work "in the MDL Court" (*id.* ¶ 88); that the proposed settlement was negotiated by "Parties who have been litigating these issues for years in the MDL Action" (*id.* ¶ 131); and that Stage Three will be assisted by "Magistrate Judge Cott as mediator in the MDL Action" (*id.* ¶ 148).[38] These concessions demonstrate the overlap between the issues raised by the Rule 23 Motion and the issues presently being decided by this Court and, accordingly, the need for withdrawal of the reference.

### 2) The Reference Should Be Withdrawn To Prevent Simultaneous and Inefficient Notice Proceedings.

Before the Bankruptcy Court may approve class notice, it must make specific findings, based on "solid record" evidence, that it will "likely" be able to certify the class and approve the settlement. Rule 23(e)(A); 2018 Advisory Comm. Notes to the 2018 Amendments to Fed. R. Civ.

---

[38] The Supreme Court's *Amchem* ruling dictates that any class certification motion for purposes of the proposed settlement would require the same degree of scrutiny from the Bankruptcy Court as the certification motion now before this Court. *See, e.g., Amchem Prod., Inc.* v. *Windsor*, 521 U.S. at 620-21 (a court "[c]onfronted with a request for settlement-only class certification " must apply "undiluted, even heightened, attention in the settlement context"); *Schoenbaum v. E.I. Dupont De Nemours & Co.*, 2009 WL 4782082, at *12 (E.D. Mo. Dec. 8, 2009) (holding that a settlement "does not justify less rigorous—and potentially less accurate—class certification proceedings . . ."). In *Schoenbaum*, the court rejected plaintiffs' contention that evaluation of the propriety of a litigation class would unduly delay class certification and approval of a settlement-only class. *Id.* (*citing Amchem Prod., Inc.* v. *Windsor*, 521 U.S. at 621). The *Schoenbaum* court further stated: "It is the Court's duty to balance the often competing goals of resolving matters promptly and resolving matters by the most accurate means possible. The Court finds that these goals are best served by *requiring Plaintiffs to demonstrate that they will be able to certify classes for both settlement and litigation*, instead of permitting Plaintiffs to proceed solely on settlement-related issues and address litigation class certification at a later stage." 2009 WL 4782082, at *12 (emphasis added).

P. 23(e).  These findings require consideration of the same evidence and issues pending decision in this Court.  Thus, if the Bankruptcy Court approves notice based on findings of fact or legal conclusions that conflict with this Court's rulings on the pending motions, the notice may have to be revised, or may become moot, wasting millions of dollars and causing considerable confusion.

In addition, if the Bankruptcy Court and this Court separately certify overlapping classes of Ignition Switch Plaintiffs, millions of vehicle owners could receive *multiple conflicting and confusing class notices*.[39]  For example, under the proposed settlement, putative class members and potential personal injury plaintiffs will receive a single postcard, directing them to information on a settlement website.  They will not be allowed to opt out, but will have to monitor the website for months until further information is posted, requiring them to take action and submit claims in order to share in any settlement proceeds.  *See* Long Form Notice, Rule 23 Mot. Ex. G.

By contrast, in the MDL proceedings, if a class is certified, putative class members would presumably be sent notices of 23(b)(3) classes, which would provide them with the opportunity to opt out and *exclude* themselves from the class.  The confusion resulting from multiple, conflicting notices would impermissibly jeopardize absent class members' rights.  Moreover, if this Court agrees with New GM and rejects the MDL plaintiffs' Motion for Class Certification pending in

---

[39]  The Movants propose a notice plan that would provide written notice to "All persons in the United States who, prior to July 10, 2009, purchased or leased a vehicle manufactured by GM that were later included in the following recalls: (1) Delta Ignition Switch Vehicles included in Recall No. 14v047: 2005-2010: Chevy Cobalt, 2006-2011 Chevy HHR, 2007-2010 Pontiac G5, 2007-2010 Saturn Sky, 2003-2007 Saturn ION, and 2006-2010 Pontiac Solstice; and (2) Low Torque Ignition Switch Vehicles, which are included in Recall Nos. 14v355, 14v394, and 14v400: 2005-2009: Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2011 Buick Lucerne, and 2006-2008 Chevrolet Monte Carlo; 2003-2014 Cadillac CTS and the 2004-2006 Cadillac SRX; and 1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999- 2004 Oldsmobile Alero; and (3) Side Airbag Defect Vehicles included in Recall No. 14v118: 2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook; and (4) Power Steering Defect Vehicles included in Recall No. 14v153: 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura."  Declaration of Cameron Azari, Esq., Rule 23 Mot., Ex. F. at ¶ 13.

this Court, then putative class members would—if the Bankruptcy Court were to preliminarily approve the proposed settlement—receive class wide notice of a settlement inconsistent with the rulings of this Court, further adding to the confusion.  A single court should address and decide whether any class certification is appropriate, and if so, determine and approve any notice sent to the millions of non-parties purportedly bound by the proposed settlement or other class actions.  Failure to coordinate proceedings risks wasting millions of dollars and confusing millions of alleged class members.

> **3)    The Reference Should Be Withdrawn Because The Bankruptcy Proceeding Raises Overlapping Questions of Law and Fact With the Already Pending District Court Action.**

This Court's decisions on the legal rules that govern the viability and value, if any, of MDL plaintiffs' claims are indispensable to the liquidation of the Plaintiffs' claims in the Bankruptcy Court.  There are numerous overlapping legal and factual issues for economic loss claims alone:

- Manifest Defect Rule.  This Court has held, or plaintiffs agree, that a manifest defect is required for claims in various jurisdictions.  For example, this Court ruled that New York and Texas require a manifest defect as a predicate for bringing a claim.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 430-31, 452 (S.D.N.Y. 2017), *modified on reconsideration*, No. 14-MC-2543 (JMF), 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017).  Plaintiffs also agree that at least the following states require a manifest defect: Arkansas, New Hampshire, North Carolina, North Dakota, South Carolina, and Utah.[40]  Consequently, the proposed settlement includes persons whose claims would be barred altogether in many states and limited in other states by the prior rulings of this Court.[41]

- Plaintiffs Who Sold Prior to the Recalls.  This Court dismissed all economic loss claims

---

[40]    The Court has also ruled that Oklahoma requires a manifest defect for consumer fraud and breach of implied warranty claims, *see In re: Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *36-37; that Pennsylvania requires a manifest defect for fraudulent concealment and breach of implied warranty claims, *see* 257 F. Supp. 3d at 438-440; and that Missouri requires a manifest defect for breach of implied warranty claims, *see In re: Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *35.

[41]    Ex. 2, 5/25/18 Bankr. Hr'g Tr. at 24 ("Likewise, any other rulings that have been issued by Judge Furman that has an impact on damages or damage theories, state by state or otherwise, are going to be built into the estimation proffer that we give you.") (Mr. Weisfelner).  Plaintiffs claim to have "refined" their damages estimates based on this Court's rulings (Rule 23 Motion at ¶ 40), but they have not shown their work to the Court, the Bankruptcy Court, or New GM.  Nor have they adjusted their notice population to reflect any of this Court's rulings.  Moreover, plaintiffs' proposed settlement and notice program does not appear to reflect any such efforts at refinement, given the broad scope of the proposed classes and notice recipients.

brought by plaintiffs who had sold, traded in, or returned their allegedly defective vehicles prior to the recalls.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 403 (S.D.N.Y. 2017).  The Court granted plaintiffs' motion for reconsideration of its order, *see In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017), stating that some claims in some states might not require damages, while continuing to hold that plaintiffs who sold before the recall announcements failed to "articulate a coherent theory" for how to "logically, if not legally, prove . . . damages" for these claims. *Id.* at *2.

- The Effect of New GM's Recall Repairs.  In its April 2018 Order on New GM's Motion for Summary Judgment with Respect to Plaintiffs' Claims for Benefit-of-the-Bargain Damages, the Court stated that "that the viability of [p]laintiffs' claims for benefit-of-the-bargain damages is likely to turn on the question of whether New GM actually fixed the recalls at issue in its many recalls."  *In re Gen. Motors LLC Ignition Switch Litig.*, 2018 WL 1638096, at *2 (S.D.N.Y. Apr. 3, 2018).  That issue has been fully briefed and is presently pending before this Court.  The effectiveness of New GM's recall repairs is critical to determining whether the proposed economic loss settlement classes have legally cognizable claims and thus standing under Article III.  Indeed, plaintiffs have admitted that, for two of the recalls, the recall repairs worked.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 2018 WL 1638096, at *2 n.1 (S.D.N.Y. Apr. 3, 2018) ("The Court recognizes, as New GM argues, that Plaintiffs do not dispute that New GM's recall 'cured' the 'Power Steering Defect.'"); Pls. Opposition to New GM Motion for Summary Judgment Against Bellwether Economic Loss Plaintiffs (Dkt. No. 6059) at 4 n.1 ("Regarding Recall Nos. 14v188 (side-impact airbags) and 14v153 (power steering) . . . Plaintiffs acknowledge that the evidence now demonstrates that the remedies offered under those recalls are effective in repairing the defects.").

To estimate (*i.e.*, liquidate) the claims involved in the proposed settlement, the Bankruptcy Court would have to—for each of the issues set forth above—"apply the legal rules which govern the ultimate value of the claim."  *In re Enron Corp.*,  2006 WL 544463, at *4, (S.D.N.Y. Jan. 17, 2006); *accord In re Siegmund Strauss, Inc.*, 2013 WL 3784148, at *8 (Bankr. S.D.N.Y. July 17, 2013).  This process would largely duplicate this Court's work for the very same claims.

Furthermore, the Court is already set to decide fundamental issues that directly impact the proposed Stage Two estimation procedures as well as Stage Three allocation and distribution. Counsel for the Movants readily admit as much:  "[a]ny merits-based issues that the [MDL Court] has previously made or will make in the future will be reflected by necessity as part of the estimation proceedings."  (Ex. 1, 12/20/18 Bankr. Hr'g Tr. at 15.)  The Bankruptcy Court has also

noted that this Court has decided these merits-based issues: "[Judge Furman]'s decided many, I'll refer to them as 'merits issues,' that deal with economic loss. Why shouldn't the reference be withdrawn and Judge Furman decide all of the class issues?" *Id.* at 22-25. Movants reiterated this position in their February 13, 2019 letter to the Bankruptcy Court, noting that such rulings "will be taken into account at the estimation proceeding stage." (Plaintiffs' 2/13/19 Letter at 3, Bankr. Dkt. No. 14424, Dkt. No. 6480-1.) Moreover, Movants represented that rulings on the MDL briefing are "anticipated by June 2019" and in any event are "very likely" to be issued "long before the estimation proceedings begin." *Id.* And counsel has also admitted that during the Stage Three distribution and allocation proceedings, the Bankruptcy Court may need to "decertif[y]" or "re-jigger[]" the certified classes because the interests of the class members may not be aligned. (Ex. 1, 12/20/18 Bankr. Hr'g Tr. at 11.) Without knowing the outcome of this Court's future rulings, it is impossible to even guess—let alone predict—the outcome of the Stage Two estimation hearing, which is, in turn, tied to the findings the Bankruptcy Court must make under Rule 23(e) and *Ortiz* concerning the liquidated amount of personal injury claims and the size of the settlement fund. Thus, even putting aside that Movants improperly seek certification of limited fund classes (Stage One) *before* it can be known whether the requirements for such certification can be met (Stages Two and Three), the Bankruptcy Court has no suitable basis in the record to determine that the relief provided for the alleged millions of class members is "likely" to be adequate, much less fair and reasonable.

In addition to the obvious overlap between this Court's future rulings and the impacts those rulings will have at the proposed Stage Two estimation hearing or Stage Three allocation procedures, the settlement agreement directly ties the fate of the proposed settlement to this Court's rulings on the summary judgment briefing. Section 4.5 of the settlement agreement provides that

if this Court "issues an Opinion or Order on [New GM's summary judgment motion] . . . that impacts the size, scope or composition of the classes of Economic Loss Plaintiffs, the Parties shall, within five (5) business days . . . engage in good faith negotiations regarding the applicable provisions of this Settlement Agreement impacted by said decision."  Movants thus expressly acknowledge that the summary judgment briefing directly impacts the certification of the proposed classes, and that they (and the Bankruptcy Court) may need to revisit certification after this Court's rulings.

Additionally, the GUC Trust's termination rights in section 10.2 of the settlement agreement confirm the connection between the proposed settlement and the summary judgment briefing in this Court.  First, the GUC Trust may unilaterally terminate the settlement agreement if the Preliminary Approval Order is not entered on or before September 15, 2019, which is more than six months after the Movants' requested hearing date.  (Settlement § 10.2(a).)  There is no reason the Movants would anticipate that the Bankruptcy Court may not enter the Preliminary Approval Order for seven months other than the expectation that the Bankruptcy Court may wait for relevant developments in this Court.  Second, the GUC Trust may unilaterally terminate the settlement agreement if Co-Lead Counsel appeals this Court's summary judgment decision. (Settlement § 10.2(b).)  Again, this termination right would be pointless if events in this Court were unrelated to approval of the proposed settlement.  Presumably, the GUC Trust negotiated for this right because it recognized that a negative ruling from this Court could significantly delay resolution of the issues relating to the proposed settlement.

Where, as here, a bankruptcy proceeding shares overlapping questions of law and fact with an already pending District Court action, the reference should be withdrawn.  *See*, *e.g.*, *Solutia, Inc. v. FMC Corp.*, 2004 WL 1661115, at *3 (S.D.N.Y. July 27, 2004) (granting motion to

withdraw reference; noting "[b]y litigating this non-core matter in the district court, judicial resources will be conserved instead of having two courts administer two rounds of briefing and argument on the same issues."); *1800Postcards, Inc. v. Morel*, 153 F. Supp. 2d 359, 367 (S.D.N.Y. 2001) (finding that where facts, transactions and issues underlying a creditors' committee's complaint overlap with underlying non-core claims pending in District Court, "efficiency counsels withdrawing the referral of the committee's claims"); *Mishkin v. Ageloff*, 220 B.R. 784, 800 (S.D.N.Y. 1998) (withdrawal of reference in core proceedings was warranted, because the proceedings were "overlapping and interlocking"); *In re Casimiro*, 2006 WL 1581897, at *6 (E.D. Cal. June 6, 2006) ("Although bankruptcy courts are empowered to oversee class actions, there is little reason to assume that they regularly do so.  On the other hand, the district court has long experience in the management of this complex class of litigation.").  Withdrawing the reference ensures uniformity and an appropriate sequence for determining the overlapping issues.  *See In re Parmalat*, 320 B.R. at 50 (withdrawing the reference because, *inter alia*, permitting the Bankruptcy Court to decide certain issues in the first instance would be inefficient and counterproductive to the goals of the multi-district litigation); *ResCap Liquidating Trust*, 518 B.R. at 265-66 (finding that withdrawal of the reference was warranted to, *inter alia*, prevent duplicative work); *In re Durso Supermarkets*, 170 B.R. 211, 213-14 (S.D.N.Y. 1994) (noting "unnecessary costs could be avoided by a single proceeding in the district court").  The substantial overlap between the two proceedings justifies withdrawal of the reference to ensure the two proceedings are appropriately coordinated and sequenced.

4)     **The Reference Should Be Withdrawn Because The Bankruptcy Proceeding Raises Overlapping Questions of Law and Fact With the Already Pending District Court Action.**

Withdrawal of the reference is also appropriate here because 136 of the personal injury/wrongful death plaintiffs who are specifically identified in the settlement agreement and

who are not otherwise eligible for a settlement have claims pending in the MDL. The overlapping legal and factual issues concerning these claims—facts and issues that were relevant to the bellwether trials over which this Court presided—include, but are not limited to contributory negligence, accident causation, injury causation, the specific defect at issue, weather and road conditions at the time of the accident, the condition of the vehicle at the time of the accident, the claimant's speed, whether the claimant was intoxicated, the role of other drivers, the credibility of witnesses, the impact of the plaintiff's injuries, spoliation of evidence, and alleged damages.

Moreover, the Court has *already* resolved numerous motions relating to personal injury/wrongful death claims. In particular, as discussed above, this Court ruled that the proposed expert opinions supporting Co-Lead Counsel's "run-accessory-run" theory (supporting claims involving airbag deployment) were inadmissible under *Daubert*. *In re General Motors LLC Ignition Switch Litig.*, Dkt. No. 4905. As the Court is aware, on the basis of that ruling, the parties have dismissed numerous airbag deployment claims from the MDL. This Court's run-accessory-run ruling similarly should preclude airbag deployment claims from being allowed or estimated in Bankruptcy Court. In sum, it would be inefficient for the Bankruptcy Court to simultaneously adjudicate the same personal injury/wrongful death claims and defenses that this MDL Court has been charged with overseeing.

**5)   The Reference Should be Withdrawn Because of This Court's Deep Familiarity With The Facts And Legal Issues Relating to Economic Loss and Personal Injury Claims.**

This MDL has been pending for more than four years. During that period, the Court has overseen these consolidated proceedings and issued scores of rulings on substantive and procedural issues. This Court's thorough familiarity with the facts and issues implicated by the economic loss and personal injury/wrongful death claims also weighs in favor of withdrawing the reference. *See Mishkin* 220 B.R. at 799-800 (promoting judicial economy and uniformity is the

critical consideration); *Houbigant, Inc.* v. *ACB Mercantile, Inc. (In re Hourbigant, Inc.)*, 185 B.R. 680, 686 (S.D.N.Y. 1995); *Big Rivers Elec. Corp.* v. *Green River Coal Co., Inc.*, 182 B.R. 751, 756 (W.D. Ky. 1995) (exercising discretion to withdraw the reference and noting that "a judge's knowledge of the facts is a factor that may be considered in deciding a motion to withdraw the reference"); *see also Dev. Specialists, Inc.* v. *Orrick, Herrington & Sutcliffe, LLP*, 2011 WL 6780600, at *4 (S.D.N.Y. Dec. 23, 2011) ("[T]he unfinished business claims involve a pure—and novel—issue of New York law.  Although Judge Drain has spoken to the legal viability of those claims, the Bankruptcy Court has no particular expertise to bring to bear on resolving it.").

> **B.   Withdrawal of the Reference Will Not Cause Significant Delay.**

In addition to concerns of efficiency, courts should consider the potential delay and the costs to the parties.  *In re Burger Boys, Inc.*, 94 F.3d 755, 762 (2d Cir. 1996).  Withdrawal of the reference will not cause significant delay.  Class certification and class notice issues must be adjudicated before the proposed settlement can be approved.  Moreover, Co-Lead Counsel has already confirmed that the Plaintiffs' entitlement to any recoveries under the proposed settlement depends on "merits-based issues that the [MDL Court] has previously made or will make in the future [that] will be reflected by necessity as part of the estimation proceedings."  (Ex. 1, 12/20/18 Bankr. Hr'g Tr. at 15.)  Accordingly, withdrawal of the reference will not cause delay because the Plaintiffs cannot recover until this Court resolves critical issues that are pending before it, which Movants will then incorporate into Stages Two and Three.   Plaintiffs would not receive consideration under the proposed settlement—if they receive any consideration whatsoever—until after the completion of Stage Three.

> **C.   Withdrawal of the Reference Promotes Uniformity in Bankruptcy Administration Because the Proposed Settlement Involves Issues More Commonly Addressed in the District Courts.**

Where, as here, Old GM's chapter 11 plan was confirmed long ago and the remaining

claims involve non-bankruptcy issues that are more commonly addressed in district courts, uniformity in bankruptcy administration weighs in favor of withdrawing the reference. *See Complete Mgmt., Inc.* v. *Arthur Andersen, LLP (In re Complete Mgmt., Inc.)*, 2002 WL 31163878, at *3 n.5 (S.D.N.Y. Sept. 27, 2002) (withdrawal of core matters warranted because, among other things, the district court had familiarity with related securities litigation and the proceeding required determination of "legal issues more commonly resolved by [the district] court than the bankruptcy courts"); *Wedtech Corp.* v. *London (In re Wedtech Corp.)*, 81 B.R. 237, 239 (S.D.N.Y. 1987) (rejecting the objector's argument that motion to withdraw should be denied because of the proponent's desire to slow down the proceeding; "issues of fairness and judicial economy militate in . . . favor [of withdrawal] nonetheless."); *General Media v. Guccione (In re General Media, Inc.)*, 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005) (noting "all courts that have addressed the question have ruled that once confirmation occurs, the bankruptcy court's jurisdiction shrinks").

In addition to the constitutional issues identified in Part I, *supra*, the dispositive non-bankruptcy questions raised by the proposed settlement include:

- Can Co-Lead Counsel and the purported class representatives satisfy the requirements of Rule 23, including the typicality (Rule 23(a)(3)) and adequacy of representation (Rule 23(a)(4)) requirements that have already been briefed in this Court?

- Can Plaintiffs' experts' opinions demonstrate class-wide injury and damages—that is, are they (i) legally cognizable, and (ii) do they satisfy *Daubert*?

- Can millions of individuals who have not experienced a manifest defect recover for economic losses under the laws of 51 jurisdictions?

- Can millions of individuals whose vehicles have been repaired recover economic losses under the laws of 51 jurisdictions?

- Can claimants who sold their vehicles before the recalls recover under the laws of 51 jurisdictions?

- Can personal injury/wrongful death Plaintiffs prove that their accidents and injuries were caused by Old GM?

Approval of the proposed settlement thus depends upon, among many other things, Rule 23, *Ortiz*, *Amchem*, Article III, the Due Process Clause, the Seventh Amendment, the Rules Enabling Act, the case law under *Daubert*, the contract laws of many jurisdictions, and state-by-state common law, rather than issues arising under bankruptcy law. This Court should decide these non-bankruptcy issues, which are critical to assessing the proposed settlement.

In sum, consideration of "what will promote uniformity of bankruptcy administration" weighs in favor of withdrawing the reference. *See ResCap Liquidating Trust,* 518 B.R. at 266–67 (noting that uniformity factor weighs in favor of withdrawal because, among other things, the District Court had more familiarity with claims governed by state law and the claims did not involve "complicated questions of bankruptcy law").

### D.   Withdrawal of the Reference Is Necessary to Prevent Plaintiffs' Forum Shopping.

Co-Lead Counsel initially pursued their claims based on Old GM's conduct in the MDL. However, after a series of adverse rulings by this Court on the very issues implicated by the settlement,[42] Co-Lead Counsel shifted their focus to the Bankruptcy Court, where they sought to avoid litigation against New GM.

Co-Lead Counsel have repeatedly tailored their Bankruptcy Court strategy to attempt to avoid this Court's class certification procedures and other MDL rulings. For example:

- In February 2015, Co-Lead Counsel's bankruptcy counsel candidly admitted that plaintiffs had made a "strategic" decision not to pursue the GUC Trust, choosing instead to pursue New GM. (2/18/15 Bankr. Hr'g Tr. at 134, excerpts attached as

---

[42]   *See, e.g., In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 430-31, 452 (S.D.N.Y. 2017), *modified on reconsideration*, 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017) (manifest defect rule required for all claims under New York and Texas law); *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353 (S.D.N.Y. July 15, 2016) (manifest defect rule required for some claims law in certain other states); *In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 3443623 at *2 (noting, despite granting reconsideration of the Court's dismissal of claims because of failure to show damages for plaintiffs who had sold, traded in, or returned their allegedly defective vehicles prior to the recalls, plaintiffs' continued failure to "articulate a coherent theory" for how to "logically, if not legally, prove . . . damages" for these claims).

Ex. 5.)

- In denying plaintiffs' motion to withdraw the reference in 2015, this Court noted that "there is some indication that Plaintiffs are forum shopping.  Judge Gerber largely ruled against them in resolving New GM's motions to enforce . . . ."  *Motors Liquidation Co.*, 538 B.R. 664.

- Prior to this Court's August 2017 successor liability ruling granting New GM summary judgment in various jurisdictions, Co-Lead Counsel admitted to the Bankruptcy Court that "depending on the resolution of [New GM's successor liability summary judgment motion], one could anticipate that the vim and vigor with which the plaintiffs prosecute" their claims against the GUC Trust "may change."  (1/12/17 Bankr. Hr'g Tr. at 10:24-11:2, excerpts attached as Ex. 6.)

- Their bankruptcy counsel also admitted that Co-Lead Counsel attempted to design the prior proposed settlement, which did not adhere to Rule 23, to avoid "confus[ion]" with the MDL.  (12/18/17 Bankr. Hr'g Tr. at 151:25-152:7 (Weisfelner testimony), excerpts attached as Ex. 7.)

Notably, the Proposed Class Claims that the Plaintiffs sought to resolve (without application of Rule 23) under their prior settlement were asserted under Rule 23(b)(3), the same basis that Plaintiffs assert in the MDL.  Following the Bankruptcy Court's ruling in September 2018 that the prior settlement required application of Rule 23, however, the Plaintiffs for the first time adopted a "limited fund" theory pursuant to Rule 23(b)(1)(B).  Withdrawing the reference under these circumstances prevents any attempt to forum shop.  *Cf. Dev. Specialists,* 462 B.R. at 473 ("[I]nsofar as the Firms are entitled to have their dispute, which implicates only private rights, finally determined in this Court, the Court does not condone forum shopping by allowing them to come here sooner rather than later"); *In re Pan Am Corp*, 163 B.R. 41, 44 (S.D.N.Y. 1993) (finding no forum shopping when party sought to have disputes arising from the same factual context adjudicated in one forum); *Adelphia Commc'ns*, 2006 WL 337667, at *5.

### E.      Withdrawal of the Reference Avoids Unnecessary Appeals.

The proposed settlement raises dispositive questions of law, including Constitutional issues that prevent certification and approval of the proposed settlement classes as a matter of law.  (*See*

Part I, *supra*.)   There is no advantage in having the Bankruptcy Court decide these legal questions, which would be reviewed *de novo* in any appeal to this Court.   *See Glatt v. Fox Searchlight Pictures, Inc.,* 811 F.3d 528, 538 (2d Cir. 2016) ("We review the district court's class certification ruling for abuse of discretion and the conclusions of law that informed its decision to grant certification *de novo*."); *In re Wilborn*, 609 F.3d 748, 752 (5th Cir. 2010) (similarly reversing bankruptcy court's decision certifying a class under *de novo* review of legal issues); *cf. In re Bayshore Wire Products Corp.*, 209 F.3d 100, 103 (2d Cir. 2000) ("Like the District Court, we review the Bankruptcy Court's findings of fact for clear error [and] its conclusions of law *de novo*.").

## CONCLUSION

The proposed settlement raises substantial and material questions of non-bankruptcy federal law, including interpretation of important Constitutional issues identified by the Supreme Court relating to mandatory class action settlements, the effect of the Due Process Clause on the number and timing of subclasses, class notice, and whether a class with millions of uninjured members can be certified.   Because these issues require "significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes," *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991), withdrawal is mandatory.

Independently, there is ample cause to grant permissive withdrawal.   It would be inefficient—and risk inconsistent results and unnecessary appeals—for the Bankruptcy Court to address the same issues of non-bankruptcy law that are currently pending in this Court on complex factual and legal issues central to both the proposed settlement and the MDL.   Plaintiffs themselves recognize this, which is why they built into the proposed settlement termination rights and obligations to negotiate further over settlement terms dependent upon what this Court rules on the overlapping issues pending in this Court.

New GM therefore respectfully requests that the District Court enter an order withdrawing the reference as to the Rule 23 Motion.

*[Remainder of Page Intentionally Left Blank]*

Dated: February 22, 2019
       New York, New York

Richard C. Godfrey, P.C.
Andrew B. Bloomer, P.C.
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654-3406
Telephone:  (312) 862-2000
Facsimile: (312) 862-2200

*MDL 2543 Counsel for*
*General Motors LLC*

/s/ Paul M. Basta
Paul M. Basta
Aidan Synnott
Kyle J. Kimpler
Sarah Harnett
Dan Youngblut
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Bankruptcy Counsel for General Motors LLC*