UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

*This Document Relates To All Actions*

------------------------------------------------------------------------------x

14-MD-2543 (JMF)
14-MC-2543 (JMF)

<u>OPINION AND ORDER</u>

JESSE M. FURMAN, United States District Judge:

**[Regarding New GM's Motion for Summary Judgment as to the Bellwether
Economic Loss Plaintiffs' Claims for Benefit-of-the-Bargain Damages]**

In February 2014, General Motors LLC ("New GM") announced the recall of certain

General Motors vehicles that had been manufactured with a defective ignition switch — a switch

that moved too easily from the "run" position to the "accessory" and "off" positions, causing

moving stalls and disabling critical safety systems. In the months that followed, New GM

recalled millions of other vehicles, some for reasons relating to the ignition switch and some for

other reasons. Not surprisingly, litigation followed, and was ultimately consolidated in this

Court by the Judicial Panel on Multidistrict Litigation. Thousands of plaintiffs filed personal

injury and wrongful death claims against New GM. And more relevant for present purposes,

hundreds of plaintiffs ("Plaintiffs") brought claims on behalf of a broad putative class of GM car

owners and lessors whose vehicles were subject to those recalls, seeking to recover for

"economic losses." Their operative complaint — the Fifth Amended Consolidated Complaint or

"5ACC" — runs nearly 1700 pages and 7500 paragraphs, and includes claims under state law

brought by named Plaintiffs in all fifty states and the District of Columbia. *See* ECF No. 4838.

Over the last few years, the Court has issued a handful of lengthy rulings on the viability

of Plaintiffs' claims under federal law and the laws of various jurisdictions. *See, e.g.*, *In re Gen.*

*Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262 (S.D.N.Y. 2018); *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2017 WL 3382071 (S.D.N.Y. Aug. 3, 2017); *In re Gen. Motors LLC Ignition Switch Litig.* ("*4ACC Op.*"), 257 F. Supp. 3d 372, 392-94 (S.D.N.Y. 2017); *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2017 WL 6509256 (S.D.N.Y. Dec. 19, 2017); *In re Gen. Motors LLC Ignition Switch Litig.* ("*3ACC Op.*"), No. 14-MD-2543 (JMF), 2016 WL 3920353 (S.D.N.Y. July 15, 2016). Following those rulings, the parties and the Court selected three "bellwether" states — California, Missouri, and Texas (collectively, the "Bellwether States") — for summary judgment, class certification, and *Daubert* motion practice. *See* ECF No. 4499 ("Order No. 131"), at 2; ECF No. 4521. Thereafter, the parties filed a wide array of motions relating to Plaintiffs in these Bellwether States. Plaintiffs filed a motion to certify classes in each Bellwether State pursuant to Rule 23 of the Federal Rules of Civil Procedure, New GM filed a motion for summary judgment with respect to the claims of each putative class, and each side filed various *Daubert* motions challenging the testimony of certain experts for the other side. *See, e.g.*, ECF No. 5846; ECF No. 5859 ("New GM SJ Mem."); ECF No. 6130 ("New GM Gans *Daubert* Mem."); ECF No. 6131 ("New GM Boedeker *Daubert* Mem.").

In this Opinion, the Court resolves portions of New GM's motion for summary judgment. In doing so, the Court addresses two related questions that have yet to be resolved in the context of a mature factual record: the proper measure of damages under Plaintiffs' "benefit-of-the-bargain" damages theory and — although it does not ultimately affect the damages claims adjudicated in this Opinion — whether and how evidence that New GM repaired Plaintiffs' vehicles through its many recalls would be relevant to the calculation of such damages. The Court reaches several significant conclusions. First, the Court holds that, in all three Bellwether

States, Plaintiffs' benefit-of-the-bargain damages are properly measured as the lesser of (1) the cost of repair or (2) the difference in fair market value between the Plaintiffs' cars as warranted and those same cars as sold. Second, that means that evidence of New GM's post-sale repairs is relevant to the calculation of Plaintiffs' damages and, indeed, could theoretically eliminate those damages altogether. And third, whether or not Plaintiffs' claims for "cost-of-repair" damages could survive New GM's motion, the Court is compelled to conclude that their claims for "difference-in-value" damages cannot because Plaintiffs have failed to introduce any evidence of the fair market value of the allegedly defective vehicles they actually purchased and, therefore, have failed to create a triable issue of fact on an essential element of any such claim.[1]

## BACKGROUND

Broadly speaking, Plaintiffs have sought relief in this litigation for economic losses pursuant to two theories of injury. One theory, the so-called "brand devaluation" theory, "assume[d] that when a consumer purchases a car, the purchase comes not only with a promise . . . that the car does not contain any safety defects, but also with the promise that the manufacturer of the car has, and will maintain, a particular reputation for making safe and reliable cars separate and apart from the car purchased by the consumer at issue." *3ACC Op.*, 2016 WL 3920353, at *7. On that theory, Plaintiffs "thought they were buying cars made by a brand that had a reputation for producing safe and reliable cars, that brand turned out not to be what consumers thought it was . . . , and when the revelations about defects and corporate culture became public the brand was tarnished, resulting in lower resale values across the board for the

---

[1] Given the significance of the Court's conclusions for this litigation, and for reasons explained below, the Court elects to go no further and leaves unaddressed for now many of the other issues that have been briefed by the parties. The Court will discuss next steps with respect to those and other issues at the next status conference.

brand's product." *Id.* (internal quotation marks omitted).  Plaintiffs thus sought damages measured according to the diminution in their cars' "resale value and the [New GM] brand's continuing good name." *Id.* (emphasis omitted).  The Court rejected the "brand devaluation" theory wholesale in deciding New GM's motion to dismiss the Third Amended Consolidated Complaint.  *Id.* at *9-10.

The Plaintiffs' second theory of injury is the by-now-familiar "benefit-of-the-bargain" theory, which recognizes that "because a car with a safety defect is worth less than a car without a safety defect," a plaintiff who bargains for a defect-free car is injured when she receives a defective one instead.  *Id.* at *7.  The Court has addressed that theory repeatedly throughout this litigation.  In ruling on New GM's motion to dismiss the Third Amended Consolidated Complaint, for example, the Court upheld the theory in the abstract — rejecting New GM's arguments "that the benefit-of-the-bargain defect theory fails across the board" and holding that "the viability of the benefit-of-the-bargain defect theory must be analyzed with respect to each Plaintiff's claims under the relevant jurisdiction's law." *Id.* at *10.  More specifically, the Court has held that Plaintiffs' claims predicated on the theory were sufficient to survive motions to dismiss under the laws of several jurisdictions, including the Bellwether States.  *See 4ACC Op.*, 257 F. Supp. 3d at 445-55 (Texas); *3ACC Op.*, 2016 WL 3920353, at *19-24 (California); *id.* at *32-35 (Missouri).  But Plaintiffs' second theory has yet to be tested on a mature factual record. In 2017, New GM moved for summary judgment on Plaintiffs' economic-loss claims in sixteen jurisdictions, including the Bellwether States, arguing that Plaintiffs received the benefit of their bargain when New GM repaired any defects through a series of recalls.  *See* ECF No. 4681.  In April 2018, the Court denied that motion without prejudice, deferring summary judgment practice in each of the Bellwether States until after the close of expert discovery on the grounds

that it was likely "evidence of post-sale mitigation would affect the availability or calculation of damages in the sixteen jurisdictions [then] at issue" and that "the viability of Plaintiffs' claims for benefit-of-the-bargain damages [could] turn on the question of whether New GM actually fixed the defects at issue in its many recalls." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2018 WL 1638096, at *2 (S.D.N.Y. Apr. 3, 2018).

With discovery now complete with respect to those claims, New GM renews its attempt to win summary judgment, this time limited to the claims of named Plaintiffs — who seek relief on behalf of themselves and on behalf of putative classes — under the laws of each Bellwether State. *See* New GM SJ Mem. 1-8. Among New GM's arguments is that, with discovery now complete, Plaintiffs have failed to produce sufficient evidence that they suffered any benefit-of-the-bargain damages in the first place. *See id.* at 19-24. In response, Plaintiffs rely on the expert testimony of Stefan Boedeker, whose analysis now serves as the proposed factual underpinning of their benefit-of-the-bargain theory. ECF No. 6059 ("Pls.' SJ Opp'n"), at 34-36. Boedeker performed what is known as a "conjoint analysis" — essentially a survey of consumer preferences for certain automotive features at certain price points. *See id.* at 35; *see also* ECF No. 5848 ("Berman Class Cert. Decl."), Ex. 214 ("Boedeker Report"), ¶¶ 23-26.[2] Boedeker proposes to measure the compensable difference in value between what Plaintiffs bargained for

---

[2]     Plaintiffs filed the Boedeker Report under seal as Exhibit 214 to the Declaration of Steve W. Berman in Support of Economic Loss Plaintiffs' Motion to Certify Bellwether Classes in California, Missouri, and Texas. *See* Berman Class Cert. Decl. 21. Although Plaintiffs did not submit the Report as an exhibit in connection with New GM's summary judgment motion, they rely on it throughout their summary judgment papers, including in their Local Rule 56.1 Statement and in their response to New GM's 56.1 Statement, *see* ECF No. 6195 ("New GM 56.1 Reply"), ¶¶ 367-69, 371; ECF No. 6196 ("New GM 56.1 Resp.") ¶¶ 273, 285, 291. Thus, there is no question that the Court may (indeed, arguably must) consider it in connection with New GM's motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

and what they received with data that purport to show the difference between what Plaintiffs paid

for their cars and what they would have been *willing* to pay had they known about the

undisclosed defects. Boedeker Report ¶ 30. In this Opinion, the Court explains why such data

are not enough, on their own, to demonstrate benefit-of-the-bargain damages under the laws of

any of the Bellwether States, and why, as a result, New GM is entitled to summary judgment on

these named Plaintiffs' claims.

## LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate where the admissible evidence and pleadings

demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir.

2012) (per curiam). A dispute over an issue of material fact qualifies as genuine if the "evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35

(2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a

genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "In

moving for summary judgment against a party who will bear the ultimate burden of proof at trial,

the movant's burden will be satisfied if he can point to an absence of evidence to support an

essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects*

*Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc.*

*v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). By contrast, to defeat a motion for

summary judgment, the non-moving party must advance more than a "scintilla of evidence,"

*Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In the final analysis, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

## B.  Applying State Law in Diversity Actions

There is no dispute that, in assessing the Bellwether States' Plaintiffs' claims, "[t]he Court is bound to apply [each state's] law to Plaintiffs' state-law claims." *3ACC Op.*, 2016 WL 3920353, at *10.  As the Court has observed before, *see In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d at 275, in applying the law of a given state, the pronouncement of the state's highest court "is to be accepted by federal courts as defining state law." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940); *accord Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1874 (2018) ("If the relevant state law is established by a decision of the State's highest court, that decision is binding on the federal courts."  (internal quotation marks omitted)).  "Where the high court has not spoken, the best indicators of how it would decide are often the decisions of lower state courts."  *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 850 (2d Cir. 1992) (citing *Comm'r of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465 (1967)).  To be sure, a federal court is not bound by the opinions of a state's lower courts. *See, e.g.*, *Calvin Klein Ltd. v. Trylon Trucking Corp.*, 892 F.2d 191, 195 (2d Cir. 1989); *see also Estate of Bosch*, 387 U.S. at 465 ("[I]n diversity cases . . . while the decrees of lower state courts should be attributed some weight[,] the decision is not controlling where the highest court of the State has not spoken on the point." (internal quotation marks and alterations omitted)).  But the decision of an "intermediate appellate state court" is "datum for ascertaining state law which is

not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West*, 311 U.S. at 237. When faced with an unsettled question of state statutory interpretation, a federal court should consider "the statutory language, pertinent legislative history, the statutory scheme set in historical context, how the statute can be woven into the state law with the least distortion of the total fabric, state decisional law, and federal cases which construe the state statute." *Bensmiller v. E.I. Dupont de Nemours & Co.*, 47 F.3d 79, 82 (2d Cir. 1995) (internal quotation marks and alterations omitted).

## DISCUSSION

New GM seeks summary judgment on various grounds, including Plaintiffs' failure to produce evidence of damages. In reviewing New GM's arguments, the Court begins, as it must, with the substantive law that governs Plaintiffs' damages theories in each of the Bellwether States. As the Court will explain, each Bellwether State measures benefit-of-the-bargain damages in cases like this one as the lesser of the cost to repair the defective vehicle or the difference in market value between the vehicle as bargained for and the vehicle as it was actually sold. Further, each Bellwether State defines market value in terms of supply and demand, or, put another way, in terms of buyers' willingness to pay (the "demand side") *and* sellers' willingness to sell (the "supply side"). The Court then turns to New GM's argument that, in light of that substantive law, Plaintiffs have failed to introduce sufficient evidence on an essential element of their claim for any benefit-of-the-bargain damages, at least as measured according to the difference in value between Plaintiffs' cars as bargained for and as actually sold.

## A.  The Benefit-of-the-Bargain Damages Theory

As its name suggests, the benefit-of-the-bargain theory seeks to compensate a plaintiff who did not get what she bargained for. Thus, as this Court has recognized — albeit in

discussing the viability of Plaintiffs' now-dismissed civil RICO claims — the benefit-of-the-bargain theory is merely a species of expectation damages. *See 3ACC Op.*, 2016 WL 3920353, at *16-17; *see generally* Restatement (Second) of Contracts § 344 (1981) (noting that a promisee's "'expectation interest' . . . is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed"). Far from an exotic theory of damages, therefore, the benefit-of-the-bargain theory is "traditionally the core concern of contract law." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 870 (1986). "Contract damages," after all, "are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." Restatement (Second) of Contracts § 347 cmt. a; *see also id.* § 344.[3]

As illustrated by this case — and others involving allegedly tortious misrepresentations — the benefit-of-the-bargain theory is not limited to the contract realm. Although some of Plaintiffs' claims sound in contract, others sound in tort or restitution, and as to them, too, Plaintiffs seek "the difference between the actual value of the car and the value the car would have had if the representation had been true." ECF No. 6059 ("Pls.' SJ Opp'n"), at 30 (quoting

---

[3]     As the Court will discuss in more detail below, this general principle holds true in each of the Bellwether States. *See, e.g.*, *Herron v. Best Buy Stores, LP*, No. 2:12-CV-2103 (TLN), 2018 WL 1960659, at *5 (E.D. Cal. Apr. 26, 2018) (describing "benefit of the bargain" damages as "expectation" damages and citing Restatement (Second) of Contracts § 347 cmt. a), *appeal filed*, No. 18-16343 (9th Cir. July 20, 2018); *Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882, 888-89 (Tex. App. 2004) ("The most common interest protected in breach of contract cases is the expectation, or benefit of the bargain, interest. Protecting this interest seeks to restore the non-breaching party to the same economic position in which it would have been had the contract not been breached — thus giving the party the benefit of its bargain."); *Birdsong v. Bydalek*, 953 S.W.2d 103, 116 (Mo. Ct. App. 1997) ("An award of damages in a breach of contract case generally serves the goal of placing the non-breaching party in as good a position as he or she would have been if the contract had been performed.").

*Auffenberg v. Hafley*, 457 S.W.2d 929, 937 (Mo. Ct. App. 1970)).  Thus — as Plaintiffs agree — where the benefit-of-the-bargain theory applies in a tort case, it compensates an injured plaintiff in the same way and according to the same theory as in a contract case: benefit-of-the-bargain damages "mean[] recovery of *what the fraudster promised*, as opposed to the property the victim lost," *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 122 (2d Cir. 2013) (emphasis added), and measure the value of what was promised according to the "value the car would have had if the representation had been true," Pls.' SJ Opp'n 30.

The Court has analyzed the benefit-of-the-bargain theory in broad strokes several times before now.  *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 2018 WL 1638096, at *1-2; *3ACC Op.*, 2016 WL 3920353, at *10; *see also In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262 (discussing the theory's viability in other jurisdictions).  As the Court has explained, the benefit-of-the-bargain theory "measures the difference in value between the defective car the consumer received and the defect-free car the consumer thought she was getting (and for which she paid)."  *3ACC Op.*, 2016 WL 3920353, at *30.[4]  But the Court has not yet expressed a view on *how* benefit-of-the-bargain damages should be measured except to say that they are to be measured at the time of sale.  *See, e.g.*, *4ACC Op.*, 257 F. Supp. 3d at 401; *3ACC*

---

[4]     The Court described the "[t]he gravamen of the benefit-of-the-bargain defect theory" as follows: "Plaintiffs who purchased defective cars were injured when they purchased for x dollars a New GM car that contained a latent defect; had they known about the defect, they would have paid fewer than x dollars for the car (or not bought the car at all), because a car with a safety defect is worth less than a car without a safety defect."  *3ACC Op.*, 2016 WL 3920353, at *7.  As this Opinion will make clear, that is an imprecise statement of the Bellwether States' laws to the extent it could be read to suggest that what Plaintiffs "would have paid" means only what Plaintiffs "would have been willing to pay" — or to the extent that it could be read to suggest that what any car is "worth" is a function only of a plaintiff's willingness to pay for it.  Instead, as the Court will explain, each Bellwether State holds that a bargained-for product is "worth" its market value, meaning that the hypothetical plaintiff bargaining for the hypothetical defective car "would have paid" less for it only because its market value would have been less, too.

*Op.*, 2016 WL 3920353, at \*10.  Moreover, the Court has explicitly left open "the question of whether and to what extent evidence of post-sale mitigation" — that is, the effectiveness of New GM's recalls (or lack thereof) — "would affect the availability or calculation of [benefit-of-the-bargain] damages" in the Bellwether States and other jurisdictions.  *In re Gen. Motors LLC Ignition Switch Litig.*, 2018 WL 1638096, at \*2.[5]  Both issues — how to calculate benefit-of-the-bargain damages and the relevance, if any, of post-sale mitigation — are matters of substantive state law.  To answer them for purposes of this Opinion and Order, therefore, the Court must delve into the substantive law of California, Missouri, and Texas.  As the following discussion makes clear, such analysis yields two principal conclusions: first, that the proper measure of benefit-of-the-bargain damages in each state is the difference in *market* value between Plaintiffs' cars as warranted and as sold; and, second, that a plaintiff's duty to avoid or mitigate damages means that post-sale repairs are relevant to the calculation of benefit-of-the-bargain damages, even though such damages are initially calculated according to the bargain that was struck at the time of sale.

### 1. California

The Court begins with California.  Under California law, Plaintiffs seek monetary awards for five causes of action: pursuant to California's Unfair Competition Law ("UCL"), Cal. Bus. &

---

[5]     Plaintiffs contend that the Court has already suggested, and even "expressly held" that post-sale mitigation evidence is irrelevant to the calculation of benefit-of-the-bargain damages, citing — for example — the Court's prior statement that New GM's "recalls, even those sufficient to remedy the defects, do not compensate Plaintiffs fully for the damages sought here." Pls.' SJ Opp'n 23 (citing *3ACC Op.*, 2016 WL 3920353, at \* 40).  But that stray remark was made in the context of a discussion of mootness, and — as the Court's April 3, 2018 Opinion makes clear — cannot reasonably be read to rule on the question addressed here.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 2018 WL 1638096, at \*2.  Similarly, although the Court has held that benefit-of-the-bargain damages must be measured at the "time of sale" — *i.e.*, when the bargain in question was struck — it does not follow that subsequent events cannot mitigate or otherwise reduce a plaintiff's entitlement to such damages.

Prof. Code § 17200 *et seq.*, Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*, Song-Beverly Consumer Warranty Act ("SBA"), Cal. Civ. Code §§ 1791.1, 1792, and for common-law fraudulent concealment and unjust enrichment.[6] Together, these causes of action provide two basic theories of recovery: actual damages and restitution. The CLRA and SBA authorize both forms of recovery, *see* Cal. Civ. Code §§ 1780(a), 1793.2(d), while the UCL, fraud, and unjust enrichment claims are limited to restitutionary remedies, *see Colgan v. Leatherman Tool Grp., Inc.*, 38 Cal. Rptr. 3d 36, 59 (Cal. Ct. App. 2006) (UCL); *3ACC Op.*, 2016 WL 3920353, at *23 (unjust enrichment); *id.* at *22 (fraudulent concealment); *see also* Cal. Civ. Code § 3343(a) (providing that "[o]ne defrauded in the purchase . . . of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with" certain types of consequential and reliance damages not claimed here). Meanwhile, the SBA contemplates benefit-of-the-bargain damages for breaches of the implied warranty of merchantability. *See* Cal. Com. Code § 2714(2) ("The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."); *Ironshore Specialty Ins. Co. v. 23andMe, Inc.*, No. 14-CV-03286 (BLF), 2015 WL 2265900, at *4 (N.D. Cal. May 14, 2015). Broadly speaking, the California causes of action here either "compensate [plaintiffs] for actual loss" (through damages) or seek to return property that

---

[6] The 5ACC also pleads a claim for negligent failure to recall under California law, but — given that the Court already granted New GM's motion to dismiss that claim, *see 3ACC Op.*, 2016 WL 3920353, at *24 — it does so "solely for the purposes of preserving the claim for appellate purposes." 5ACC ¶¶ 1663-70 n.419.

the defendant unlawfully acquired from the plaintiff and, at least under certain circumstances, to deter future violations (through restitution). *Colgan*, 38 Cal Rptr. 3d at 59.

Where benefit-of-the-bargain damages are available under California law, they compensate for "the difference between the actual value of what plaintiff has received and that which he expected to receive." *Overgaard v. Johnson*, 137 Cal. Rptr. 412, 413 (Cal. Ct. App. 1977). By contrast, where California law limits recovery to "out of pocket" losses, as it does with fraud claims generally, such damages are measured according to "the difference between the actual value received and the actual value conveyed." *Id.* If a defrauded plaintiff has conveyed value in excess of what she received in the transaction, out-of-pocket (or restitutionary) damages will seek to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 947 (Cal. 2003). Thus, for purposes of this motion in this litigation, the "out-of-pocket" and "benefit-of-the-bargain" measures of damages overlap; in both cases, calculating a monetary award depends in part on calculating the "actual value" of the allegedly defective car a Plaintiff received.

That, in turn, means that each of Plaintiffs' California claims depends on calculating the market value of the allegedly defective cars that Plaintiffs purchased. As the California Supreme Court (that is, California's highest court) has observed, "'value,' in connection with legal problems, ordinarily means market value." *Bagdasarian v. Gragnon*, 192 P.2d 935, 940 (Cal. 1948).[7] Accordingly, in awarding both benefit-of-the-bargain and out-of-pocket (or

---

[7] That observation is consistent with the federal law of benefit-of-the-bargain damages. *See, e.g.*, *United States v. United Techs. Corp.*, 782 F.3d 718, 731 (6th Cir. 2015) ("The only benchmark consistent with [the] benefit-of-the-bargain theory of damages is 'fair market value,'" which means "what a willing buyer would pay in cash to a willing seller at the time." (quoting *United States v. 564.54 Acres of Land*, 441 U.S. 506, 511 (1979))); *see also Gillespie v. United*

restitutionary) damages, courts applying California law look to the fair market value of the goods and services at issue: both the goods as bargained for (or as represented), and the goods as actually sold. *See, e.g.*, *Zakaria v. Gerber Prods. Co.*, No. LA-CV-15-200 (JAK), 2017 WL 9512587, at *20 (C.D. Cal. Aug. 9, 2017) (holding that actual damages under the CLRA depends on actual market values), *aff'd*, 755 Fed. App'x 623 (9th Cir. 2018); *Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724 (LHK), 2014 WL 7148923, at *8 (N.D. Cal. Dec. 15, 2014) (holding that restitutionary awards under the UCL and CLRA are "determined by taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices"); *Lanovaz v. Twinings N. Am., Inc.*, No. C-12-02646 (RMW), 2014 WL 1652338, at *6 (N.D. Cal. Apr. 24, 2014) (same); *Guido v. L'Oreal, USA, Inc.*, No. CV-11-1067 (CAS), 2013 WL 3353857, at *14 (C.D. Cal. July 1, 2013) (holding that damages for breach of an implied warranty under the SBA restore "the monetary equivalent of the benefit of [the plaintiff's] bargain" by reference to the "true market value" of what a plaintiff "actually received").

In reaching this conclusion, the Court is mindful of the Ninth Circuit's contrary conclusion that "UCL . . . restitution is based on what a purchaser would have paid at the time of purchase had the purchaser received all the information." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015). *Pulaski*, however, appears to overread the California Supreme Court case on which it relies. In *Kwikset Corp. v. Superior Ct. of Orange Cty.*, 246

---

*States*, 23 F.3d 36, 40 (2d Cir. 1994) ("Fair market value is commonly defined as 'the price at which the property would change hands between a willing buyer and a willing seller.'" (citing *United States v. Cartwright*, 411 U.S. 546, 551 (1973)); Black's Law Dictionary (11th ed. 2019) (defining "fair market value" as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect").

P.3d 877 (Cal. 2011), the California Supreme Court held only that a plaintiff satisfies the UCL's standing requirement "by alleging[] . . . that he or she would not have bought the product but for the misrepresentation" at issue, *id.* at 890. Such an allegation permits the reasonable inference that "because of the misrepresentation the consumer (allegedly) was made to part with more money than he or she otherwise would have been willing to expend, i.e., that the consumer paid more than he or she actually valued the product," regardless of any evidence of the actual *market* value of the product. *Id.* The *Kwikset* court could not have been clearer, however, that its holding concerned only *standing* to sue under the UCL, not the appropriate measure of a monetary award of restitution under the UCL. *See id.* at 894 ("[T]he standards for establishing standing under section 17204 and eligibility for restitution under section 17203 are wholly distinct."); *id.* at 895 (distinguishing between a plaintiff's ability to "demonstrate . . . compensable losses or entitlement to restitution" and its ability to allege standing). *Kwikset* thus stands for the unexceptional proposition that a plaintiff who alleges a subjective loss has standing to seek the UCL's non-monetary remedies, even if that same plaintiff may not be able to prove entitlement to a monetary award. *See id.* at 890-91. As for what is required to prove such an entitlement on the merits, the Court sides with the weight of post-*Kwikset* (and post-*Pulaski*) authority holding that a plaintiff must have "substantial evidence" of "measurable amounts" of an objective loss, measured according to the difference in market value of the property lost and the property received. *Zakaria*, 2017 WL 9512587, at *20-21, *aff'd*, 755 Fed. App'x 623 (9th Cir. 2018) (emphasis omitted); *see also Colgan*, 38 Cal. Rptr. 3d at 63 ("Although a trial court has broad discretion under [the UCL] to grant equitable relief, that discretion is not 'unlimited' and does not extend beyond the boundaries of the parties' evidentiary showing." (citation omitted)).

California law also recognizes the relevance of post-sale mitigation — such as New GM's recall repairs — to the calculation of a monetary award under any of Plaintiffs' theories. "The doctrine of mitigation of damages holds that a plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided." *Valle de Oro Bank N.A. v. Gamboa*, 32 Cal. Rptr. 2d 329, 331 (Cal. Ct. App. 1994) (alteration and internal quotation marks omitted); *see* Restatement (Second) of Contracts § 350 (1981) ("[D]amages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation."); *accord* 6 Witkin Summary of Cal. Law – Torts § 1803 (11th ed. 2017). Thus, a "defendant's mitigation of an injury may leave the plaintiff 'unable to prove a right to . . . restitution" or damages. *In re Myford Touch Consumer Litig.*, No. 13-CV-03072 (EMC), 2016 WL 7734558, at *19 (N.D. Cal. Sept. 14, 2016) (quoting *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1087 (Cal. 2010), and citing Restatement (Second) of Contracts § 350), *reconsideration granted on other grounds*, 2016 WL 6873453 (N.D. Cal. Nov. 22, 2016). For similar reasons, California courts have also followed the traditional rule that the measure of damages for tortious injury to personal property — such as an automobile — is the lesser of the diminution in value or the reasonable cost of repairs. *See, e.g.*, *Hand Elecs., Inc. v. Snowline Joint Unified Sch. Dist.*, 26 Cal. Rptr. 2d 446, 450-51 (Cal. Ct. App. 1994); *Safeco Ins. Co. v. J & D Painting*, 21 Cal. Rptr. 2d 903, 904 (Cal. Ct. App. 1993); *see also, e.g.*, *Olds & Stoller v. Seifert*, 254 P. 289, 290 (Cal. Ct. App. 1927); *Menefee v. Raisch Improvement Co.*, 248 P. 1031, 1032 (Cal. Ct. App. 1926).

Recent cases applying California law have held that the cost of repair is an appropriate measure of damages in product-defect cases, in particular "because it sets damages equal to the

amount necessary to make a defective part serviceable," thereby excluding any "windfall" in excess of that amount. *Salas v. Toyota Motor Sales, U.S.A., Inc.*, No. CV-15-8629 (FMO), 2019 WL 1940619, at *12 (C.D. Cal. Mar. 27, 2019) (internal quotation marks omitted); *see In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liab. Litig.*, 288 F.R.D. 445, 449-50 (C.D. Cal. 2013) (holding the plaintiffs' "benefit-of-the-bargain argument . . . insufficient as a matter of law" because once software updates were installed addressing the defective anti-lock braking system in their vehicles, the plaintiffs had "received exactly what they paid for — that is, a vehicle with a safe and operable ABS"), *aff'd sub nom. Kramer v. Toyota Motor Corp.*, 668 Fed. App'x 765 (9th Cir. 2016); *see also Nguyen v. Nissan N. Am., Inc.*, — F.3d —, No. 18-16344, 2019 WL 3368918, at *7 (9th Cir. July 26, 2019) (approving, at the class certification stage, "the nexus between [the plaintiff's] legal theory — that Nissan violated California law by selling vehicles with a defective clutch system that was not reflected in the sale price — and [the plaintiff's] damages model — the average cost of repair"). In light of the principles of California law discussed above, not to mention logic, the Court finds these cases persuasive. Thus, the Court concludes that, although the particular circumstances of a given case may affect the theory and content of an award, the core measure of benefit-of-the-bargain damages in an automotive defect case (whether predicated on California implied-warranty, CLRA, UCL, or common-law claims), is the cost to repair the defect, thereby restoring to plaintiffs the defect-free car for which they bargained. *See Falco v. Nissan N. Am. Inc.*, No. CV-13-00686 (DDP), 2016 WL 1327474, at *12 (C. D. Cal. Apr. 5, 2016) ("By receiving restitution in the amount of average repairs, the class would be getting the benefit of their bargain because they would be put in the same position they would have been had the car not been sold with the defective timing chain system — it is the cost necessary to make the vehicles conform to the value Plaintiffs thought

they were getting in the price tendered.").  By the same token, where a defendant has *already* repaired the defect, that fact may reduce plaintiff's benefit-of-the-bargain damages to zero.  *See Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 488 (S.D. Cal. 2013) (holding that allegedly defrauded UCL plaintiffs received the benefit-of-their-bargain when the defendant updated the software at issue to make it function as warranted because, "[w]ith the upgrade, [the plaintiffs] now have just what they paid for"); *In re Toyota Motor Corp.*, 288 F.R.D. at 450.  Thus, not only is New GM's evidence of post-sale mitigation plainly relevant to Plaintiffs' entitlement to damages under California-law, but it may well also erase those damages entirely.

### 2. Missouri

The Court turns, then, to Missouri.  The Court has previously held — although it described the issue as "a close one" — that "Missouri law recognizes the benefit-of-the-bargain defect theory" for claims sounding in contract and tort.  *3ACC Op.*, 2016 WL 3920353, at *34. As for the proper *measure* of such damages, which the Court has not yet had occasion to address, Missouri law recognizes the traditional rule that contract damages should place an injured party, "as far as it is possible to do so by a monetary award, . . . in the position he would have been in had the contract been performed."  *Boten v. Brecklein*, 452 S.W.2d 86, 93 (Mo. 1970) (internal quotation marks omitted); *see id.* (noting that the injured party "is entitled to the benefit of his bargain, that is, whatever net gain he would have made under the contract" (internal quotation marks omitted)); *see* Mo. Ann. Stat. § 400.2-714 ("The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.").  At the same time, such damages should not "place [a] plaintiff in a *better* position than he would have been had the

contract been completed on both sides." *Brecklein*, 452 S.W.2d at 93 (emphasis added) (quoting

*Dingman v. Elizabeth Arden Sales Corp.*, 284 S.W.2d 16, 18 (Mo. Ct. App. 1955)).  Along

similar lines, the Missouri Plaintiffs' sole remaining statutory claim, arising under the Missouri

Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010 *et seq.*, requires proof of an

"ascertainable loss," measured according to "the benefit-of-the-bargain rule, which compares the

actual value of the item to the value of the item if it had been as represented at the time of the

transaction." *Plubell v. Merck & Co.*, 289 S.W.3d 707, 715 (Mo. Ct. App. 2009).[8]

As in the other two Bellwether States, when Missouri law is concerned with "value" as a

measure of damages, value refers to *market* value.  *See Larabee v. Eichler*, 271 S.W.3d 542, 548

(Mo. 2008) (en banc) ("[The] 'benefit of the bargain' rule[] . . . states the appropriate measure

for damages in a fraudulent misrepresentation case is the difference between the fair market

value of the property received and the value if the property had been as represented.").  Indeed, a

long line of Missouri cases equate "actual value" with "market value."  *See, e.g.*, *Metro. St. Ry.*

*Co. v. Walsh*, 94 S.W. 860, 868 (Mo. 1906) ("[T]he market value of the property means its actual

value, . . . that is, the fair value of the property as between one who wants to purchase and one

who wants to sell it; not what could be obtained for it in peculiar circumstances when greater

than its fair price could be obtained; nor its speculative value; nor the value obtained through the

necessities of another. . . .  The question is if the defendant wanted to sell its property, what

could be obtained for it upon the market from parties who wanted to buy and would give its full

value." (internal quotation marks omitted)).  Testimony regarding the subjective, or private,

---

[8]     In spite of the Court's prior holding that such a claim requires actual manifestation of the
defect in question, *3ACC Op.*, 2016 WL 3920353, at *35, the 5ACC also pleads a breach of the
implied warranty of merchantability under Mo. Rev. Stat. § 400.2-314 on behalf of Plaintiffs
"whose vehicles have not suffered from an actual manifestation solely for the purpose of
preserving the claims for appellate review."  5ACC ¶¶ 4316-25 n.435.

value of property to its owner does not suffice. *See, e.g*, *St. Louis, Keokuk & Nw. R.R. Co. v. St. Louis Union Stock-Yard Co.*, 25 S.W. 399, 400 (Mo. 1894) (distinguishing between the "opinion of [a] witness as to the value of the property to the owner, and [the property's] market value," where "[i]t was the market value that was the question of inquiry and consideration"); *Evinger v. McDaniel Title Co.*, 726 S.W.2d 468, 474-75 (Mo. Ct. App. 1987) ("Proof of fair market value cannot be supplied by evidence as to the value of the property to the plaintiff individually, as a witness'[s] subjective opinion or his feeling or guess as to the value of property may not be equated with or substituted for fair market value.").

Additionally, upon reviewing the relevant authorities, the Court concludes that Missouri law also treats evidence of New GM's post-sale repairs as relevant to the calculation of Plaintiffs' damages. "Generally," under Missouri law, "the measure of damages for tortious injury to property is its diminished value — the difference between the fair market value of the property immediately before and immediately after the injury. But when there is evidence that the amount of damage is insignificant, as compared to the value of the property as a whole, and involves only a small part of the property, the 'cost of repair' measure is proper . . . ." *Kaplan v. U.S. Bank, N.A.*, 166 S.W.3d 60, 71-72 (Mo. Ct. App. 2003); *see also Crawford v. Whittaker Constr., Inc.*, 772 S.W.2d 819, 822 (Mo. Ct. App. 1989) (noting, in a case involving a contract for construction of a house, that "the general rule that the proper measure of damages in this situation is whichever is lower, as between the cost of repair and the diminution of value (diminution meaning the difference in value of the house if it had been constructed properly compared with its actual value as constructed.) The rationale underlying this rule is that plaintiffs are entitled to recover as damages only a sum which is equivalent to performance of the bargain — to be placed in the position they would have been in if the contract had been fulfilled

in a workmanlike manner." (internal quotation marks omitted)). Missouri courts also recognize that, in cases of "slight injury" to property, "the cost of repair logically reflects the amount the property was reduced in value." *Kaplan*, 166 S.W.3d at 72 (emphasis and internal quotation marks omitted). And, generally, the "cost of repairs" is "competent evidence to be considered in determining the damage suffered," *Tull v. Hous. Auth. of Columbia*, 691 S.W.2d 940, 943 (Mo. Ct. App. 1985); *see also Conner v. Aalco Moving & Storage Co.*, 218 S.W.2d 830, 832 (Mo. Ct. App. 1949), and may be the basis for a damages award where there is *no* evidence of fair market value, *see Tull*, 691 S.W.2d at 942. "While diminished value is the preferred measure of damages in tort cases because it restores plaintiffs to the positions they were in had the tort not been committed, the particular facts of each case determine which measure is appropriate." *Kaplan*, 166 S.W.3d at 72; *see also Clayton Ctr. Assocs. v. Schindler Haughton Elevator Corp.*, 731 F.2d 536, 540 (8th Cir. 1984) (noting that where Missouri law's "goal in awarding damages is to give the injured party the benefit of its bargain, . . . . [t]wo alternative measures of damages are used to achieve this goal" in repair contract cases: either "the cost of repair or completion of the contract work, or the diminution in value . . . caused by the breach . . . . [T]he particular facts of each case seem to govern which measure of damages is appropriate.").

Indeed, in cases with facts similar to this one, Missouri courts uniformly treat the costs of repair as *relevant* to damages even where damages are based on the difference in value before and after the harm. *See, e.g.*, *Wright v. Edison*, 619 S.W.2d 797, 801 (Mo. Ct. App. 1981) ("Where repairs to personal property such as an automobile result in causing it to be more valuable than it was before the injury, such excess must be deducted from the cost of repairs. On the other hand[,] if the item after repairs are made is still not as valuable as it was before the injury, then the owner may recover in addition to the cost of repairs such amount as will equal

the difference between the value of the item of personal property before the injury and after the repairs were made upon it." (citation omitted)); *accord Hayes v. Dalton*, 257 S.W.2d 198, 201 (Mo. Ct. App. 1953); *Conner*, 218 S.W.2d at 832 (Mo. App. 1949); *see also Cline v. City of St. Joseph*, 245 S.W.2d 695, 702 (Mo. Ct. App. 1952) ("As a general rule there can be no recovery for losses which might have been prevented by reasonable efforts on the part of the person injured. A failure to attempt to mitigate damages will not bar plaintiff entirely from a recovery, but will only prevent the recovery of such damages as might have been avoided by reasonable efforts upon his part."). By the same logic, if the cost of repair would restore the vehicle to *exactly* its pre-accident value, it would follow that the cost of repair should provide the primary — if not exclusive — measure of damages.

Sure enough, in recent years, Missouri courts have tacked towards the view that while "the measure of damage to an automobile is [generally] the decrease in its fair market value after the accident, . . . if [the automobile] can be repaired to its prior state, the cost of repair is a measure of damages." *Shapiro v. Kravitz*, 754 S.W.2d 44, 45 (Mo. Ct. App. 1988) (citations omitted). Thus, Missouri's intermediate appellate court has held that "[c]ompensatory damages in a fraud action where the defrauded party retains the property are limited to the benefit of the bargain from the sales transaction," meaning that where "awarding the cost of repair would . . . give [the plaintiff] the benefit of her bargain," it is "unnecessary to award damages measured by the diminution in value of her property." *Brown v. Bennett*, 136 S.W.3d 552, 557 (Mo. Ct. App. 2004). Similarly, in *Farning v. Brendal*, 150 S.W.3d 384, 386 (Mo. Ct. App. 2004), a breach of warranty case, the Missouri Court of Appeals held that "the cost of repair was less than the diminution in value and was, therefore, the correct measure of damages," because "the goal in awarding damages is to make an award that will put the non-breaching party in as good a

position as he would have been in if the contract had been performed," and an award of difference-in-value damages "put the [plaintiffs] in a better position than they would have been in had the [defendants] installed the flooring as warranted," thereby "giving the [plaintiffs] a windfall by giving them new flooring at no cost." Indeed, in ordinary contract cases, Missouri law's concern with avoiding wasteful remedies promotes a rule measuring damages according to the cost of repair or replacement except where those costs are "disproportionate" to the diminution in value. *Stom v. St. Clair Corp.*, 153 S.W.3d 360, 364 (Mo. Ct. App. 2005). Based on its review of Missouri authorities, the Court therefore concludes that where Missouri law seeks to restore the benefit of a plaintiff's bargain in cases most analogous to this one, it generally awards the lesser of the cost of repair or the diminution in market value caused by the fraud or breach.

### 3. Texas

That leaves Texas. "The general principle governing damages for breach of contract" in Texas "is that the complaining party is entitled to recover the amount necessary to put him in as good a position as if the contract had been performed" — *i.e.*, the benefit-of-the-bargain rule. *Smith v. Kinslow*, 598 S.W.2d 910, 912 (Tex. Civ. App. 1980). Similarly, "[t]he actual damages to which a plaintiff is entitled in" a case under the Texas Deceptive Trade Practices Act ("TDPTA"), Tex. Bus. & Com. Code §§ 17.41 *et seq.* "are the same as damages recoverable at common law," such as in an implied warranty action, namely "the difference between the market value of the property as warranted and the market value of the property as delivered." *Mercedes-Benz of N. Am., Inc. v. Dickenson*, 720 S.W.2d 844, 848 (Tex. App. 1986); *see also Town E. Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 801 (Tex. App. 1987) ("[T]he difference between the actual cost of the . . . automobile and the value of the automobile in its defective condition. . . . is

the correct measure of damages in a DTPA action based upon the sale of an automobile." (emphasis omitted)). "[I]n order to sustain such a finding of damages" under Texas law, "there must be evidence of both the actual amount paid by the buyer and the actual market value of the car as received in its defective condition." *Town E. Ford Sales*, 730 S.W.2d at 801; *accord Matheus v. Sasser*, 164 S.W.3d 453, 462 (Tex. App. 2005) ("Under either the benefit-of-the-bargain or the out-of-pocket measure of damages, the plaintiff is also required to prove the fair market value of the item *as received*."). Thus, Texas courts distinguish between the *subjective* value of a defective vehicle to its buyer and its *objective* market value, which is the appropriate focus of a benefit-of-the-bargain damages calculation. *See, e.g.*, *Vista Chevrolet, Inc. v. Lewis*, 704 S.W.2d 363, 371-72 (Tex. App. 1985) (holding that witness testimony as to the buyer's private valuation of the defective vehicle was not competent evidence of its market value), *aff'd in part, rev'd in part on other grounds*, 709 S.W.2d 176 (Tex. 1986). "Market value is the amount that would be paid in cash by a willing buyer who desires to buy, but who is not required to buy, to a willing seller who desires to sell, but who does not need to sell." *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 888 (Tex. App. 2008); *accord Taub v. City of Deer Park*, 882 S.W.2d 824, 827 (Tex. 1994) ("Market value is the price the property would bring in a transaction between a willing seller and a willing buyer.").

Similarly, like Missouri and California, Texas takes the cost of repairs (and the fact of repairs already performed) into account when calculating how far of his or her bargain a plaintiff has been kept short. As Texas's intermediate civil appellate court has held, in an automotive-defect case, "[i]f the cost of repairing the vehicle [is] more than the loss in its fair market value, then the loss in fair market value [is] the measure of damage. If the car [is] subject to repair, and the cost of its repair [is] less than the loss in fair market value, then the cost-of-repair measure of

damages [is] applicable." *Orr Chevrolet, Inc. v. Courtney*, 488 S.W.2d 883, 886 (Tex. Civ. App. 1972). More recently, a California federal court applying Texas law held that because the defendant had already repaired the defects in the plaintiff's truck, the plaintiff was "already in essentially the same position he would have been in had Defendant sold him a non-defective truck." *Sater v. Chrysler Grp. LLC*, No. ED CV 14-700 (VAP), 2016 WL 7377126, at *7 (C.D. Cal. Oct. 25, 2016). "Permitting [the plaintiff] to retain benefit-of-the-bargain damages for the difference in value between a non-defective truck and the defective truck" in that circumstance, "*even though Defendant has repaired his truck*, would afford him precisely the type of double-recovery windfall Texas courts have held is impermissible." *Id.*[9]

In short, based on the available Texas authorities, the Court is persuaded that Texas law measures benefit-of-the-bargain damages in cases like this one according to the lesser of (1) the cost of repair or (2) the difference in fair market value between the car as warranted and as sold. And, where a defendant has successfully repaired a defective vehicle, Texas's prohibition on duplicative recoveries will not permit a plaintiff to recover anything further as far as the benefit of her bargain is concerned. Such a plaintiff has received all for which she bargained.

### 4. Conclusion

In sum, the Court concludes that in all three of the Bellwether States the proper measure of benefit-of-the-bargain damages is generally the lower of (1) the cost of repair or (2) the

---

[9]    Like Plaintiffs here, *see supra* note 5, the plaintiffs in *Sater* relied on this Court's statement that New GM's "recalls, even those sufficient to remedy the defects, do not compensate Plaintiffs fully for the damages sought here." *3ACC Op.*, 2016 WL 3920353, at *40; *see Sater*, 2016 WL 7377126, at *8. The *Sater* Court recognized, correctly, that this Court's observation was made at the pleading stage in connection with an analysis of mootness. *See* 2016 WL 7377126, at *8. In any event — as the Court has already explained, *see supra* note 5 — the stray statement in this Court's 2016 Opinion is not controlling here. Nor, in the face of persuasive Texas authority to the contrary, could it be.

difference between the fair market value of the vehicle as warranted and the fair market value of the vehicle as sold, reduced according to Plaintiffs' ability to mitigate or avoid damages. That is the difference between what Plaintiffs bargained for (namely, cars free of safety defects) and what they got (namely, cars with one or more defects) — which is what the benefit-of-the-bargain theory seeks to measure. That is not to say that Plaintiffs are wrong in arguing, or that the Court was wrong in previously noting, *see 4ACC Op.*, 257 F. Supp. 3d at 401; *3ACC Op.*, 2016 WL 3920353, at *10, that benefit-of-the-bargain damages must be measured at the time of sale. That, after all, is when the "bargain" was made, and the theory measures damages according to the bargain that was struck. But it does not follow — and it is not the law, at least in the Bellwether States — that all post-sale conduct is irrelevant. To hold otherwise would confer on Plaintiffs, and any other plaintiffs who claim similar injuries, an immutable damages asset, redeemable upon sufficient proof regardless of any mitigated harm.[10] In any event, the Court is bound to apply the law as it actually exists in each Bellwether State, each of which has, through its courts or otherwise, chosen not to embrace that type of remedy. Moreover, the Bellwether States have done so for defensible reasons: From a contract perspective, "efficiency requires that a disappointed promisee use his remedy to vindicate his expectation interest in the cheapest possible way, rather than proceeding wastefully. A promisee who may . . . claim[] a quantum of damages that reflects an unnecessarily expensive route to vindicating his contractual expectation . . . loses the incentive to cure efficiently." DANIEL MARKOVITS, CONTRACT LAW & LEGAL METHODS § 5.4, at 119 (2012). In tort, such a remedy may lead to duplicative recoveries

---

[10]     Or, as New GM puts it: "If [P]laintiffs' argument that post-sale remedies could never be considered were correct, then short of a court judgment, no seller could ever give or restore a person's benefit-of-their bargain post-sale, and double recovery would be commonplace." ECF No. 6194 ("New GM SJ Reply"), at 5 n.5.

and wasteful levels of precaution. *Cf. In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 & n.1 (7th Cir. 2002).

## B. The Sufficiency of Plaintiffs' Benefit-of-the-Bargain Evidence

Having summarized the substantive law of damages in the three Bellwether States, the Court turns to whether there is evidence in the record that would allow a reasonable factfinder to find such damages in this case. Significantly, at a trial in these cases, Plaintiffs would bear the burden of showing that they are entitled to damages, *see, e.g.*, *Raishevich v. Foster*, 247 F.3d 337, 343 (2d Cir. 2001), which means that for them to defeat New GM's motion pointing out an absence of evidence on that issue, they must come forward with evidence that would be "sufficient to establish the existence" of damages, *Celotex*, 477 U.S. at 322. More specifically, although Plaintiffs may not need to prove the *amount* of damages to an absolute certainty to survive summary judgment, they do — under the law of all three Bellwether States — need some evidence of the *fact* of damages (if not more) to create a triable issue on that element of their claim. *See, e.g.*, *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1443 (9th Cir. 1990) ("It is well-established under California law that while the *fact* of damages must be clearly shown, the *amount* need not be proved with the same degree of certainty . . . ."); *TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. SA-CV-14-0341 (JVS), 2016 WL 6562075, at *11 (C.D. Cal. Aug. 9, 2016) (explaining that a plaintiff's failure to offer proof of either the fact or quantum of damages requires the entry of summary judgment); *Tate v. Goins, Underkofler, Crawford & Langdon*, 24 S.W.3d 627, 635 (Tex. App. 2000) ("While uncertainty as to the *amount* of damages is not fatal" at summary judgment, "lack of evidence or uncertainty as to the *fact* of damages is."); *see also, e.g.*, *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 864 (8th Cir. 2010) (noting that, under Missouri law, a plaintiff must introduce sufficient evidence

capable of proving both "the existence and amount of damages with reasonable certainty" in order to survive summary judgment (alteration and internal quotation marks omitted)); *Penzel Constr. Co., Inc. v. Jackson R-2 Sch. Dist.*, 544 S.W.3d 214, 244 (Mo. Ct. App. 2017) (noting that a plaintiff must "present[] sufficient evidence to provide a jury an 'adequate basis' for calculating a rational estimate of damages"); *Best Buy Builders, Inc. v. Siegel*, 409 S.W.3d 562, 565 (Mo. Ct. App. 2013) (noting that a plaintiff has the "burden of presenting a basis for a rational estimate of damages" to the jury).

Here, that means that Plaintiffs must have some evidence of, among other things, the market value of the allegedly defective vehicles that they actually received. *See, e.g.*, *Astiana v. Ben & Jerry's Homemade, Inc.*, No. C 10-4387 PJH, 2014 WL 60097, at *12-13 (N.D. Cal. Jan. 7, 2014) (holding that the "plaintiff has provided *no* damages evidence" because she had not "offered any expert testimony demonstrating that the market price of Ben & Jerry's ice cream with the 'all natural' designation was higher than the market price of Ben & Jerry's without the 'all natural' designation.  Thus, by definition, there is no evidence showing how much higher the price of one was than the other" (emphasis added)); *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 96 (Ct. App. 2009) (noting that, while "[t]he difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution[,] [i]n order to recover under this measure, *there must be evidence of the actual value of what the plaintiff received*.") (citation omitted) (emphasis added); *Town E. Ford Sales*, 730 S.W.2d at 801 (noting that, "in order to sustain . . . a finding of damages" based on the difference in values in an automotive defect case, "there must be evidence of both the actual amount paid by the buyer and the actual market value of the car as received in its defective condition"); *Larabee*, 271 S.W.3d at 548 (noting that a plaintiff must have "sufficient evidence of a difference between the fair market

value of the property received and the property had it been as represented" to "support[] the existence of damages"); *Givan v. Mack Truck, Inc.*, 569 S.W.2d 243, 249 & n.8 (Mo. Ct. App. 1978) (stating that, "even if" a "difference in values" measure of damages "were appropriate, plaintiffs failed to present any evidence of the value of a new 1972 Mack truck with the uncured defects"). Moreover, in each Bellwether State, the evidence must actually be of *market* value — evidence of private valuations masquerading as evidence of market value will not do. *See, e.g.*, *Vista Chevrolet*, 704 S.W.2d at 371-72 (Texas); *Evinger*, 726 S.W.2d at 474-75 (Missouri); *Zakaria v. Gerber Prods. Co.*, 755 Fed. App'x 623, 624-25 (9th Cir. 2018) (California); *Redwood City Elementary Sch. Dist. v. Gregoire*, 276 P.2d 78, 81-82 (Cal. Ct. App. 1954) (California).

Finally, and perhaps most significantly, under the substantive law of all three Bellwether States, market value is determined by the interaction of *both* supply *and* demand. *See, e.g.*, *Children's Hosp. Cent. Cal. v. Blue Cross of Cal.*, 172 Cal. Rptr. 3d 861, 872 (Ct. App. 2014) (stating that fair market value is "is the price that a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts" (internal quotation marks omitted)); *In re Marriage of Cream*, 16 Cal. Rptr. 2d 575, 579 (Ct. App. 1993) (stating that fair market value "is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no obligation or urgent necessity to do so, and a buyer, being ready, willing and able to buy but under no particular necessity for so doing"); *Peterson v. Cont'l Boiler Works, Inc.*, 783 S.W.2d 896, 900 (Mo. 1990) ("Fair market value is not determined by value to the owner alone; it is measured also by the price that one who wishes, but does not need to buy, will pay."); *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 521 (5th Cir. 2013) (noting that, under Texas law, "[m]arket value is the amount a

willing buyer, who is under no obligation to buy, would pay to a willing seller, who is under no obligation to sell"); *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 831 (Tex. 2014) (observing that an "offer price does not, alone, tend to establish the property's market value at the time it was made. [An] offer is some evidence of what a willing buyer will pay, but it is not, alone, evidence of what a willing seller will accept"). Evidence that fails to account for both phenomena is not evidence of market value.

Relying on these principles, New GM argues that Plaintiffs' evidence is insufficient to permit a reasonable jury to award "difference-in-value" damages. *See* New GM SJ Mem. 19-24 & nn.10-12. New GM contends that the evidence upon which Plaintiffs rely to show a difference in value between what they paid for and what they received — namely, the expert analysis of Stefan Boedeker — is insufficient to prove difference-in-value damages under the substantive law of the three Bellwether States. *See id.* at 22-24.[11] Notably, in response, Plaintiffs do not point to any *other* evidence that could support a finding of damages. Instead, they put all of their eggs in the Boedeker basket and argue that his testimony is sufficient to establish benefit-of-the-bargain damages and thus to stave off summary judgment. *See* Pls.' SJ Opp'n 34-36; *see also* Boedeker Report; Berman Class Cert. Decl. Ex. 215 ("Boedeker Rebuttal Report"). It follows that New GM's motion for summary judgment turns (for present purposes) on whether it is right about Boedeker's testimony. If Boedeker's testimony is not competent evidence of difference-in-value damages, then New GM has satisfied its burden on summary judgment by "point[ing] to an absence of evidence to support an essential element of" Plaintiffs' claims, and Plaintiffs have failed to rebut that showing. *Goenaga*, 51 F.3d at 18. If Boedeker's testimony *would* be

---

[11]     Plaintiffs rely also on the expert analysis of Joshua Gans. But Gans merely "analyzed Mr. Boedeker's . . . analysis" and "did not do his own 'survey work." ECF No. 6184, at 2-5. Thus, Gans's testimony does not affect the Court's analysis or conclusions.

competent evidence of difference-in-value damages, however, then summary judgment cannot be granted (at least on the grounds discussed here).

Although the issue is a close one, the Court concludes that New GM has the better of the argument. The core of Boedeker's opinion is that "[t]he non-disclosure of defects caused class members," including the named Plaintiffs, "to overpay for their vehicles." Boedeker Report ¶ 22. To arrive at this conclusion, Boedeker used a survey methodology known as "conjoint analysis." *Id.* ¶ 23. Conjoint analysis measures consumer desires by asking survey respondents about their relative preferences for certain combinations of product features. *Id.* ¶ 25; *see, e.g.*, *Saavedra v. Eli Lilly & Co.*, No. 2:12-CV-9366 (SVW), 2014 WL 7338930, at *4 (C.D. Cal. Dec. 18, 2014) ("Conjoint analysis is a statistical technique capable of using survey data to determine how consumers value a product's individual attributes — often called the market's willingness to pay."); *accord Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1103-04 (N.D. Cal. 2018); *Zakaria*, 2017 WL 9512587, at *9. On Boedeker's telling, for example, a conjoint analysis survey might ask consumers whether they would choose to buy cotton seeds with one set of features for $16, seeds with a more advanced set of features for $75, or if — presented with that choice — whether they would instead buy neither seed. Boedeker Report ¶ 25 fig. 1. By evaluating respondents' answers to such questions, conjoint analyses "measure preferences for product features, . . . how changes to price affect demand for products or service[s], and . . . forecast the likely acceptance of a product if brought to market." *Id.* ¶ 24 (internal quotation marks omitted).

For example, Boedeker calculated how respondents would value a car with a *disclosed* side airbag defect by presenting them with the following survey question:



*Id.* ¶ 91 fig. 9.  By compiling and analyzing responses to that and similar survey questions, Boedeker was able to estimate the amount that consumers would be willing to pay for a vehicle with a particular defect that was fully disclosed — as in the above example, a vehicle with a fully disclosed side airbag defect.  *See id.* ¶ 116.  Boedeker was thus able to construct hypothetical "demand curves" for vehicles in the "but-for" world — that is, the world in which New GM had disclosed the alleged defects before selling the allegedly defective cars.  *See id.* & fig. 19.  Significantly, however, Boedeker's model focuses only on changes to the demand side of the equation.  That is, he calculated only how *consumers' willingness to pay* would be affected by the disclosure of the defects at issue.  *See, e.g.*, ECF No. 6075 ("Pixton Class Cert Decl."), Ex. 40 ("7/6/18 Boedeker Dep."), at 462:11-18 ("Q. You are not opining that new GM would be willing to sell these option packages at the prices offered in your conjoints, are you? . . . A. I'm not opining on New GM's willingness to sell those option packages at those prices.  That is

correct.").  Indeed, Boedeker's report explicitly assumes that the supply curve — that is, the range of prices at which New GM would be willing to *sell* any given quantity of defective cars — would remain unchanged in the "but-for" world in which those defects were fully disclosed. *See id.* ¶ 66 ("The number of vehicles that were supplied without disclosure in the actual-world is identical to the number of vehicles supplied in the but-for-world where the defect was disclosed and for which economic losses have to be computed.").

In his rebuttal report, Boedeker clarifies that he made this assumption in order to fit a particular legal interpretation of how to measure benefit-of-the-bargain damages.  *See* Boedeker Rebuttal Report ¶ 565.  "[P]laintiffs' damage theory," he explains, "is 'benefit-of-the-bargain' damages, which requires no consideration of *changed* supply because the supply in the but-for-world is the same number of defective vehicles that were supplied in the actual world with the only difference that GM concealed the defect in the actual world but disclosed the defect at the point of purchase in the but-for-world."  *Id.*  Thus, Boedeker did not estimate any possible changes in New GM's willingness to *sell* a car with a known, acknowledged, and disclosed defect — instead, he assumed that "the new equilibrium" (*i.e.*, market) "price" in the but-for world would be the price at which "all the purchasers of defective vehicles in the actual-world would also buy in the but-for-world."  Boedeker Report ¶ 67.  Using that methodology, Boedeker came up with a chart that Plaintiffs cite as their sole evidence showing difference-in-value damages.  *See* Berman Decl. Ex. 43.  The chart lists each named Bellwether State Plaintiff and Boedeker's estimated economic loss damages based on his conjoint analysis of consumer willingness to pay for a vehicle with the particular alleged defect fully disclosed.  *Id.*; Pls.' SJ Opp'n 34.

Under the substantive law of the Bellwether States discussed above, this evidence does not suffice to establish damages. The benefit-of-the-bargain theory awards damages based on the difference between what the plaintiff paid for and the fair market value of what the plaintiff received. As Boedeker acknowledges, fair market value is determined according to the equilibrium price of a good, Boedeker Report ¶ 43, and the "equilibrium price is not the simple average of all consumers' willingness to pay. Rather, the equilibrium price depends on supply and demand," *id.* ¶ 44. "In other words," Boedeker himself explains, "the willingness-to-pay does not necessarily reflect the actual price that a consumer ends up paying for a product." *Id.* ¶ 46. The problem is, as Boedeker himself acknowledges, his model measures only the effect that a disclosed defect would have on *willingness to pay. Id.* ¶ 67; Boedeker Rebuttal Report ¶ 565. Indeed, Boedeker straightforwardly admits that he did not inquire into New GM's willingness to sell. *See, e.g.*, 7/6/18 Boedeker Dep. 462:11-18; Pixton Class Cert Decl. Ex. 34 ("7/5/18 Boedeker Dep."), at 235:3-20 ("Q. And there's no information that you've looked at about GM's willingness to sell vehicles at different price points at all either? A. No."); Pixton Class Cert Decl. Ex. 110 ("6/29/18 Gans Dep."), at 429:2-8 ("Q. So [Boedeker] did not analyze GM's willingness to sell at the actual or but-for price? A. No[.]"); Pixton Class Cert Decl. Ex. 111 ("6/28/18 Gans Dep."), at 281:6-10 (Gans testifying that his "opinion is that [he] would find it highly unlikely that GM — it would have wanted to — sell the same amount of cars at the price implied by Mr. Boedeker's 'but-for' analysis."). Boedeker's evidence thus measures consumers' private valuations (on average) of certain hypothetical GM vehicles sold with fully disclosed defects; it does not measure the *market value* of those vehicles.

For that reason, Boedeker's conjoint analysis does not provide competent proof of Plaintiffs' damages.[12] Notably, that conclusion is supported by a handful of decisions that have (in various procedural contexts) rejected conjoint analyses as evidence of market value for precisely the same reason. *See Zakaria*, 2017 WL 9512587, at *17-21 (decertifying a damages class because a conjoint analysis that measured only plaintiffs' changed willingness to pay was "insufficient to establish a basis for calculating either restitution or actual damages" under California law); *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) (denying class certification because the plaintiffs' proffered conjoint analysis tested only what consumers were willing to pay "without considering other factors in a functioning marketplace," and therefore "[did] not address the fair market value of NJOY's e-cigarettes absent the misrepresentations and omissions." (emphasis omitted)); *id.* at 1122 ("A consumer's subjective valuation of the purported safety message, measured by their relative willingness to pay for products with or without the message, . . . does not permit the court to calculate the true market price of NJOY e-cigarettes absent the purported misrepresentations."

---

[12]     Because the problem with Plaintiffs' claims is not "some fatal dissimilarity but, rather, a fatal similarity" — namely, a "failure of proof as to an element of the plaintiffs' cause of action" — they are properly resolved "as a matter of summary judgment, not class certification." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047 (2016) (internal quotation marks omitted). That is not to say, however, that the flaws with Boedeker's analysis identified in this Opinion would be irrelevant to the other motions before the Court. For example, expert testimony is admissible under Rule 702 of the Federal Rules of Evidence only if it "help[s]the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. In the absence of evidence concerning New GM's willingness to sell, however, Boedeker's testimony would not assist the jury in determining any fact in issue. In other words, because his testimony, without more, is not "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute" as to Plaintiffs' damages — *i.e.*, because it is proffered as evidence of market value (as opposed to merely being offered to prove the willingness of consumers to pay for particular types of hypothetical cars) — it would be excludable under Rule 702, which "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591-92 (1993).

(emphasis omitted)); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846 (LHK), 2014 WL 976898, at *12 (N.D. Cal. Mar. 6, 2014) (denying a motion for permanent injunctive relief because the proffered conjoint analysis measured only demand and did "not account for supply at all, much less the real-world intersection of market demand and market supply, which sets the real-world market price," leaving the plaintiff without evidence of a price increase); *Saavedra*, 2014 WL 7338930, at *5 (denying class certification because the proffered conjoint analysis accounted for demand but not supply, and reasoning that such a "method of computing damages converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants. The Court has found no case holding that a consumer may recover based on consumers' willingness to pay irrespective of what would happen in a functioning market (i.e. what could be called sellers' willingness to sell).").

    *Zakaria* is representative of these cases. In that case, a class sought compensation for the alleged overpayment for infant formula based on a misleading label. 2017 WL 9512587, at *1 The parties agreed that the proper measure of damages was "the amount of the price premium, if any," that the plaintiffs were induced to pay as a result of the deceptive label. *Id.* at *18. But because the plaintiffs' proposed conjoint analysis showed only consumers' "potential willingness to pay a premium," the court held that "market value [had] not been demonstrated adequately" for purposes of California law and decertified the class. *Id.* at *20-21. On appeal, the Ninth Circuit affirmed by summary order. The Court explained — citing *Pulaski* — that, under California law, "plaintiffs can measure class-wide damages using methods that evaluate what a consumer would have been willing to pay for the product had it been labeled accurately." 755 Fed. App'x at 624 (memorandum disposition). The Court then continued:

Such methods must, however, reflect supply-side considerations and marketplace realities that would affect product pricing. . . . Dr. Howlett's conjoint analysis did not reflect market realities and prices for infant formula products. [It] showed only how much consumers subjectively valued the 1st and Only Seal, not what had occurred to the actual market price of Good Start Gentle with or without the label. Thus, regardless whether consumers were willing to pay a higher price for the labelled product, the expert's opinion did not contain any evidence that such higher price was actually paid; hence, *no evidence of restitution or actual damages was proffered. . . . Dr. Howlett's conjoint analysis alone therefore does not create a genuine issue of material fact* regarding the amount of restitution or actual damages.

*Id.* at 624-25 (emphasis added). In short, where the law awards damages based on the difference in market value, evidence — including conjoint analyses — that measures only consumers' subjective valuation or willingness to pay is not sufficient evidence of such damages.

Although none of those decisions are binding on this Court, they are persuasive and consistent with the substantive law of each Bellwether State discussed above. The Court thus concludes that Boedeker's demand-side-only evidence not only fails to estimate hypothetical market conditions, but also fails to qualify as evidence of benefit-of-the-bargain damages entirely. That conclusion is further supported by logic and common sense. To see why, one need only consider a hypothetical Widget Company that manufactures and sells widgets. The market price of a working widget is $100. One day, the Widget Company discovers that it has manufactured a batch of widgets with a latent defect that would cost an additional $5 to repair. The Widget Company calls an expert who performs a conjoint analysis to determine that consumers would be willing to pay $75 for a widget knowing that it had that particular defect. Would the Widget Company sell its defective widgets for $75 each? Or (assuming it remained profitable to do so, given the additional cost) would it pay $5 each to repair each widget, and sell each one for $100, instead recovering $95 per widget? Obviously, in that scenario the Widget Company would not sell its defective widgets at the price consumers would be willing to pay for them. Instead, it would repair the widgets and sell them for $100, making $20 per widget in

marginal profit relative to the alternative option (having recouped $95 rather than $75 per widget sold). The point is that New GM's willingness to sell would undoubtedly be different in the but-for world in which Boedeker has attempted to model consumers' willingness to pay — that is, the world in which the alleged defects in GM's cars had been fully disclosed.[13]

It is true, as Plaintiffs argue, that various courts have approved of the use of conjoint analyses to measure benefit-of-the-bargain damages — in some cases, no less, analyses proffered by Boedeker himself. *See Hilsley v. Ocean Spray Cranberries, Inc.*, No. 17-CV-2335 (GPC), 2019 WL 3006465, at *4 (S.D. Cal. July 10, 2019); *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 370-73 (N.D. Cal. 2018); *Hadley*, 324 F. Supp. 3d at 1105-06 (N.D. Cal. 2018); *Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520, 542-43 (N.D. Cal. 2018); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018); *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d at 970-71; *Broomfield v. Craft Brew All., Inc.*, No. 17-CV-01027 (BLF), 2018 WL 4952519, at *19 (N.D. Cal. Sept. 25, 2018); *Davidson v. Apple, Inc.*, No. 16-CV-04942 (LHK), 2018 WL 2325426, at *22 (N.D. Cal. May 8, 2018); *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 332 (D.N.H. 2017); *Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988, 995 (S.D. Fla. 2016); *In re: Lenovo Adware Litig.*, No. 15-MD-02624 (RMW), 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1023-32 (C.D. Cal. 2015); *Guido v. L'Oreal, USA, Inc.*, No. 2:11-CV-01067 (CAS), 2014 WL 6603730, at *7-14 (C.D. Cal. July 24, 2014); *see also* ECF No.

---

[13] New GM drives the point home by noting that Boedeker's model suggests that Plaintiff Deloris Hamilton should receive as much as $4,714 in benefit-of-the-bargain damages even though she paid only $3,500 for her car. New GM SJ Reply 13; *see* New GM 56.1 Resp. ¶ 297 table 1, at 221; New GM 56.1 Reply ¶ 245. That is, a jury would have to conclude that New GM would have been willing to pay Hamilton to accept her car. In these circumstances, no reasonable jury could do so.

6187 ("Pls.' Boedeker *Daubert* Opp'n"), at 34-41. In some of these cases (for example, *Arris Cable* and *Sanchez-Knutson*), however, the courts did so with little or no consideration of the market price issue. In others (for example, *Guido*, *Lenovo*, and *ConAgra*), the courts found (whether correctly or not) that the conjoint analyses *did* take into consideration market prices. *See Zakaria*, 2017 WL 9512587, at *19-20 (distinguishing *Lenovo* and *ConAgra* on that basis). And the remaining cases are distinguishable, unpersuasive, or both.

One group of these cases, for example, involved classic allegations of mislabeling. *See Hadley*, 324 F. Supp. 3d at 1105; *Broomfield*, 2018 WL 4952519, at *19; *Fitzhenry-Russell*, 326 F.R.D. at 606; *Dial Complete Mktg.*, 320 F.R.D. at 329; *Hilsley*, 2019 WL 3006465, at *1; *Schneider*, 328 F.R.D. at 527. On the whole, the courts in these cases found that the conjoint analyses "adequately account[ed] for supply-side factors" because "(1) the prices used in the surveys underlying the analyses reflect[ed] the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect[ed] the actual quantities of products sold during the class period." *Hadley*, 324 F. Supp. 3d at 1105. In a classic mislabeling case, however, that makes sense. A conjoint survey that asks respondents whether they would rather pay *x* for a product labeled "100% Fruit Juice" or *y* for a similar product labeled "50% Fruit Juice," for example, would account for supply-side factors if both *x* and *y* reflect the prices for which juice companies actually sell similarly labeled products in the marketplace. Accounting for supply-side factors is not so simple, however, where the alleged misrepresentations and omissions concern dangerous defects, as in this case.[14] After all,

---

[14]     To extend the hypothetical, this case is closer to one in which a merchant is alleged to have sold juice containing 5% poison (and to have concealed that fact). To pass muster under the *Hadley* line of cases, the conjoint analysis in such a case would have to assemble market-based pricing data for the equivalent of a juice box labeled "5% Poison." Separate and apart from the fact that consumers' willingness-to-pay would likely be driven to zero by such a label,

products containing such defects are rarely (if ever) sold (or allowed to be sold by regulators) when the defects are fully disclosed.  It follows that market data for products in the but-for scenario are not available, as Boedeker himself concedes.  *See* Boedeker Rebuttal Report ¶ 442 (acknowledging that "no market data is available on the value that consumers place on defects").[15]

In the other cases, courts approved of conjoint analyses — including Boedeker's — on the ground that they "account[] for the supply side of the equation" because they "discuss[] the role of supply in conjoint analysis at length."  *Davidson*, 2018 WL 2325426, at *22.  Needless to say, however, merely including a section titled "Consideration of the Supply Side" in an expert report — as Boedeker does here, *see* Boedeker Report 22 — does not cut it if the analysis reflected in that expert report does not actually include meaningful consideration of supply-side factors.  That is the case here.  Boedeker's key supply-side assumptions are (1) that New GM's marginal costs would be the same in the but-for world where it disclosed the defects at the point of sale and (2) that the supply — that is, the number of cars New GM would sell — would *also* be the same.  *See* Boedeker Report ¶¶ 67-68 (explaining that his model "quantif[ies] the new equilibrium price where *all the purchasers of defective vehicles in the actual-world would also*

<hr/>

*cf., e.g.*, New GM 56.1 Reply ¶ 148 (noting one Plaintiff's testimony "that. . . she would not have purchased her vehicle if GM had told her it contained a defect like the ignition switch defect"), common sense suggests that it would be hard, if not impossible, to find historical data reflecting manufacturers' willingness to *sell* such a product in a market transaction.  To satisfy *Hadley*, however, that is what a conjoint analysis would need to do.

[15]     Plaintiffs dispute that Boedeker used "arbitrary" prices, arguing that he instead "used prices based on pricing data obtained from unchallenged and reliable sources."  Pls.' Boedeker *Daubert* Opp'n 2 (citing Boedeker Rebuttal Report ¶ 442).  A closer look at Boedeker's Rebuttal Report, however, reveals that those sources do not reflect *any* data about prices for the defects that Boedeker attempts to measure in his survey.  Instead, Boedeker apparently derived his hypothetical prices by consulting reports about how much it cost to produce each of the *safety features* included in his scenarios.  *See* Boedeker Rebuttal Report ¶ 442.

*buy in the but-for-world*").   But those assumptions are undermined by Plaintiffs' own evidence, including Boedeker's report and testimony themselves.  *See* 7/5/18 Boedeker Dep. 62-63; *see also* Boedeker Rebuttal Report ¶ 387 (acknowledging that an assumption of inelastic supply would be "fundamentally flawed" because it would "mean[] that a given product is supplied by the manufacturer in the same quantity no matter what the price is"); 6/28/18 Gans Dep. 281:6-10 (conceding that it is "highly unlikely that GM . . . would have wanted to sell the same amount of cars at the price implied by Mr. Boedeker's 'but-for' analysis").

More fundamentally, those assumptions are inconsistent with the substantive law in all three of the Bellwether States, which defines market value to mean "the price that a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell." *Children's Hosp. Cent. Cal.*, 172 Cal. Rptr. 3d at 872 (California) (internal quotation marks omitted); *accord Peterson*, 783 S.W.2d at 900 (Missouri); *Factory Mut. Ins. Co.*, 705 F.3d at 521 (Texas). To assume, as Boedeker does, that New GM would sell the same number of vehicles in the but-for world despite commanding a lower price for each vehicle at the same marginal cost per sale is to assume a massive forced sale — contrary to the substantive law in all three Bellwether States.  Put differently, although Boedeker's hypothetical constant supply curve admits that New GM would ordinarily be willing to sell a smaller quantity of vehicles at the lower price consumers would then be willing to pay, Boedeker simply assumes that New GM would be willing to sell the *same* quantity anyway, notwithstanding the lower price.  *See* Boedeker Report 21 fig. 8; *cf. MyFord Touch Consumer Litig.*, 291 F. Supp. 3d at 970 (discussing a graph similar to the one displayed as Figure 8 to Boedeker's report in this case and concluding that "the supply curve that concerns Mr. Boedeker's analysis is effectively vertical — supply is fixed regardless

of price in this region of the graph").[16]  For purposes of this motion, that is not enough.  If a gap remains in the evidence that could support factfinding about market value, the Bellwether States do not permit a plaintiff to plug the gap with assumptions.  Instead, the Bellwether States require a plaintiff to adduce evidence that, like direct evidence of actual market prices, appropriately reflects each composite element of market value.  Here, because Boedeker's evidence is insufficient to establish market value under the law in each of the Bellwether States, it is insufficient to stave off summary judgment to the extent the Court has explained.

## CONCLUSION

In the final analysis, the Court's task here is not to decide what makes sense as a matter of policy.  *Cf. MyFord Touch*, 291 F. Supp. 3d at 971 (citing "policy reasons to afford Plaintiffs a reasonable opportunity to posit damages based on a more flexible approach to economic theory").  Nor is it even to evaluate whether Boedeker's analysis passes muster as a matter of economic theory.  Instead, it is to apply the substantive law of each Bellwether State.  As discussed, that law requires that benefit-of-the-bargain damages be calculated based on the difference in *market* value between the product as warranted and the product as sold and defines

---

[16]      The Court declines to rely on *MyFord Touch Consumer Litigation* for another reason. Conducting a *Daubert* analysis, the court in that case accepted Boedeker's testimony on the ground that it could not "conclude at [that] stage that Mr. Boedeker's assumption that the supply would have been the same regardless of the change of price within the range of his survey is indisputably wrong."  291 F. Supp. 3d at 970 (internal quotation marks omitted); *see also id.* ("The assumption that Ford would have sold the same number of vehicles notwithstanding a drop in value . . . *is not so far-fetched as to be indisputably wrong.*" (emphasis added)).  Whether or not the "not indisputably wrong" standard is an accurate statement of the law in the Ninth Circuit, it is not an accurate statement of the law in the Second Circuit, where "expert testimony should be excluded if it is speculative or conjectural, the admission of expert testimony based on speculative assumptions is an abuse of discretion," and "[a]n expert's opinions that are without factual basis and are based on speculation or conjecture are . . . inappropriate material for consideration on a motion for summary judgment."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (alteration and internal quotation marks omitted).

market value as the product of *both* a consumer's willingness to pay *and* a merchant's willingness to sell, when *neither* are under any compulsion to do so. Applying that law, the Court is compelled to conclude that Boedeker's analysis does not, without more, suffice to prove that any of the Bellwether State Plaintiffs suffered benefit-of-the-bargain damages based on a difference in value. Because there is no more — that is, Plaintiffs point to no other evidence from which a factfinder could find damages based on a difference in value — there is an "absence of evidence" on an "essential element" of Plaintiffs' claims for such damages. *Goenaga*, 51 F.3d at 18. Accordingly, the Court must grant New GM's motion for summary judgment on the named Plaintiffs' claims to the extent they seek damages measured as the difference in value between their cars as bargained-for and their cars as received.

In their various motion papers, the parties have briefed many other issues, including but not limited to the viability of various claims and/or other damages theories (such as Plaintiffs' bankruptcy-fraud claims, their claims for "lost time" damages, the claims of Plaintiffs who purchased Old GM or used vehicles, the claims of Plaintiffs who disposed of their vehicles before the recalls, and the claims of Plaintiffs whose vehicles are subject to "service parts" vehicle recalls), the effectiveness of New GM's recalls and repairs, the availability of injunctive relief, class certification, and the admissibility of certain experts' testimony. In light of the ruling above, however, the Court will refrain from reaching such issues pending discussion between and with the parties and, possibly, new briefing. It does so because the ruling almost certainly moots some of the remaining issues and, with respect to the issues that are not mooted (for example, class certification), the ruling changes the landscape in dramatic ways that may call for new briefing. On top of that, and given that changed landscape, it may well make sense for the parties to revisit the issue of settlement. And, of course, Plaintiffs may petition for

certification of an interlocutory appeal.  In short, even though the parties have spilled considerable ink briefing other issues, the Court concludes, as a matter of efficient case management, that it makes more sense to stop where it has than to go on.[17]

The parties should immediately meet and confer with respect to the implications of this Opinion and Order and be prepared to address the next steps for both this litigation and the pending motion to withdraw the bankruptcy reference in 19-CV-1852 (JMF) — or, at a minimum, a process for determining the next steps — at the status conference on **August 15, 2019**.[18]

The Clerk of Court is directed to docket this Opinion and Order in 14-MD-2543, 14-MC-2543, and 19-CV-1852, and to terminate 14-MD-2543, ECF Nos. 5845, 5854, 5858, 6062, 6065, 6067, 6069,6108, 6110, 6114, 6116, and 6118.

SO ORDERED.

Dated: August 6, 2019
　　　New York, New York

_____
JESSE M. FURMAN
United States District Judge

---

[17]　　The Court had previously set January 13, 2020 as a tentative trial date for the Bellwether State Plaintiffs' claims.  ECF No. 6272, § IV.  Given both the timing and substance of the Court's ruling today, it is apparent that this case is not going to trial on that date, if at all. Accordingly, the trial date is adjourned *sine die*.

[18]　　At the August 15, 2019, the parties should also be prepared to address a process for resolving whether and to what extent the parties' submissions in connection with the motions for summary judgment, class certification, and *Daubert* can remain sealed or redacted.  For now, the parties need not follow the procedures set forth in Section X of MDL Order No. 77.